## STATE OF CONNECTICUT *v.* HERMAN VASQUEZ APODACA
## (SC 18170)

Rogers, C. J., and Palmer, Zarella, McLachlan, Harper and Vertefeuille, Js.

Argued October 20, 2011—officially released January 10, 2012

*Pamela S. Nagy*, special public defender, for the appellant (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, was *Scott J. Murphy*, state's attorney, for the appellee (state).

*Opinion*

HARPER, J. Following a jury trial, the defendant, Herman Vasquez Apodaca, was convicted of felony murder in violation of General Statutes § 53a-54c, conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134, and two counts of robbery in the first degree in violation of § 53a-134 (a) (1) and (3). The defendant appealed directly to this court, pursuant to General Statutes § 51-199 (b) (3), raising four claims. The defendant first claims that the trial court improperly dismissed a juror midtrial without adequate cause because its conclusion that it could not reconsider its decision to excuse the juror was incorrect as a matter of fact and law. The defendant also claims that his felony murder conviction must be reversed because the trial court's instructions permitted the jury to find him vicariously liable for the underlying felony (robbery in the first degree) and in turn improperly permitted the jury to find the defendant guilty of felony murder when he did not actually commit the underlying felony. Finally, the defendant contends, with

respect to the trial court's instructions on the conspiracy charge, that the court improperly failed to address the jury's request to restate the instruction in laypersons' terms and that the instruction was otherwise misleading as to which crime formed the basis of the conspiracy. We disagree with each of these claims and, accordingly, affirm the judgment.

The jury reasonably could have found the following facts. In August, 2005, the defendant, a New York resident, met John Ortiz, a New Britain barber. The defendant asked Ortiz to let him know whether he knew anyone in Connecticut who might be interested in buying large quantities of drugs. Some time after that meeting, Ortiz contacted the defendant and relayed information that a friend, Luis Bruno, was interested in making such a purchase.

On September 22, 2005, the defendant and two of his acquaintances, Eduardo Davila and Rodney Hankerson, went to New Britain, where Ortiz introduced them to Bruno. An agreement was reached to sell Bruno four kilograms of cocaine at a price of $19,000 per kilogram, with the sale to take place two days later. The defendant, Davila and Hankerson decided to use the sale as a pretext to steal Bruno's money.

On September 24, 2005, Bruno called Davila on the defendant's cell phone to express reservations about the sale, and they ultimately agreed that Bruno could purchase two, rather than four, kilograms of cocaine. Later that same day, the defendant, Hankerson and Davila drove to New Britain, where they met Ortiz in a store parking lot. Davila and Hankerson carried guns on them as directed by the defendant; the defendant gave Davila a larger gun so "it would look more intimidating" and directed Davila to give his own smaller gun to Hankerson. Hankerson brought with him a duffle bag containing rolls of duct tape and bricks of fake

cocaine made out of sheetrock. The defendant, driving one vehicle, with Hankerson as his passenger, and Davila, driving a second vehicle, followed Ortiz' car to Bruno's apartment in New Britain. Davila went to Bruno's apartment and entered through the rear door. Davila saw stacks of money piled on the kitchen table and drew his gun on Bruno. Davila then relayed a message to the defendant's cell phone indicating that everything was under control. The defendant entered the apartment, along with Hankerson who was carrying the bag containing the duct tape and fake cocaine. A fight ensued between Hankerson, Davila and Bruno. The defendant filled a grocery bag with the cash that was piled on the kitchen table and returned with it to his car, leaving Hankerson and Davila to deal with Bruno. During the struggle with Bruno, in which Hankerson and Davila tried to bind his mouth, arms and legs with the duct tape, Bruno was beaten and fatally stabbed.

Hankerson and Davila fled the apartment and drove to a rest stop, where they met the defendant. The two men had blood on their clothes, and the defendant directed them to get back into their vehicle and to follow him. The defendant led them back to his girlfriend's apartment in New York, where he gave them a change of clothes. The three men split the money taken from Bruno's apartment.

Thereafter, the defendant was arrested and charged with felony murder, two counts of robbery in the first degree and one count of conspiracy to commit robbery in the first degree. At trial, the defendant did not dispute that he had been involved in a scheme to sell Bruno drugs, but disclaimed any knowledge of the robbery or murder.

On the fifth day of evidence, a juror, A.S., called in sick, and the court thereafter excused her, over the defendant's objection, and replaced her with an alter-

nate. At the close of evidence, the trial court instructed the jury that the defendant could be found guilty on the two counts of robbery in the first degree as either a principal, an accessory, or, alternatively, under a theory of vicarious liability. The court further instructed the jury that the defendant could be found guilty of felony murder if it found that he, alone or acting with others, had committed a robbery and, in the course of or in furtherance of that crime or flight therefrom, he or another participant had caused Bruno's death.

The jury returned a verdict of guilty on all four counts. The trial court rendered judgment in accordance with the verdict and imposed a total effective sentence of sixty years imprisonment. This direct appeal followed.

I

We begin with the defendant's claim that the trial court improperly excused A.S. without the requisite finding of adequate cause. Specifically, the defendant contends that the trial court improperly determined that it could not reconsider its decision to excuse A.S., even though the initial reason for the excusal, illness, no longer existed. He further contends that such an impropriety entitles him to a new trial because it is structural in nature and not amenable to harmless error review. We conclude that the trial court's decision was proper and, therefore, we need not consider the defendant's claim of structural error.

The record reveals the following additional undisputed facts. On the fifth day of evidence in the state's case-in-chief, at 10:25 a.m., the court informed the parties that A.S. had called in to the caseflow coordinator to report that she was ill with some type of flu bug that was causing vomiting. The court asked the parties for their opinions as to whether A.S. should be dismissed. Defense counsel objected, arguing that the defendant felt strongly about keeping this particular juror on the

jury. Defense counsel requested that the court wait at least one day to allow A.S. to recover from her illness and, due to the limited availability of the state's witness set to testify that day, videotape the testimony of that witness to play to the jury upon A.S.'s return. The state disagreed, offering several reasons why A.S. should be excused. The trial court announced that it would defer its decision until 11:30 a.m.

When court reconvened, the trial court informed the parties that it had asked the caseflow coordinator to call A.S. during the recess to determine when she first had gotten sick, the status of her condition, and how she thought she might feel in a few hours, as well as the next day. The caseflow coordinator then reported the content of her telephone conversation to the court. A.S. indicated that she had begun to feel ill the previous afternoon, had gotten physically ill that evening and still was vomiting on the morning she called in. A.S. was not sure whether she would feel well enough by that afternoon or the next day to resume jury duty. In response to this report, the parties reiterated their previous positions as to whether A.S. should be excused.

In light of the defendant's objection, the trial court weighed the alternatives that the defendant had advanced. The court first rejected the option of video-taping the state's witness, reasoning that the limited authority for such a procedure did not extend to the present circumstances. The court then considered the options of delaying the trial until the following day or, alternatively, until 2 p.m. that afternoon, by which time the caseflow coordinator could obtain an update from A.S. on her condition. The court ultimately rejected those options, reasoning that A.S. presently was ill, that the court was not optimistic that she would be well enough by 2 p.m. to resume her duties and that, even if she did return, A.S. might spread her illness to other

jurors due to the close proximity that they shared. The court further reasoned that a delay could result in the loss of other jurors because the trial already had exceeded the estimated time frame that had been given to the jury and protracted testimony still lay ahead. Accordingly, the court ruled that it was excusing A.S. for the aforementioned reasons and that an alternate juror would be selected by lot.

After other court business had been conducted and a brief recess had been called, the court put on the record that the caseflow coordinator had spoken with A.S., who had indicated that she felt better and could be in court by 2 p.m. Because the alternate juror had not yet been sworn in, the court announced that it would stay its previous order until 2 p.m. to ascertain whether A.S. could resume her duties. At that time, in response to the court's inquiries, A.S. reported that she felt better and would "fight through the pain" because she wanted to continue her jury duties. After the court pressed A.S. to state with specificity the communication that she had received from the caseflow coordinator, A.S. stated that the caseflow coordinator had told her that the trial court was "thinking about excusing [her]," and that A.S. had requested that the caseflow coordinator ask the court to change its mind. When further pressed, A.S. acknowledged that she was not sure whether the caseflow coordinator had said that the court "was thinking of excusing" her or that the court had excused her.

The trial court then called in the caseflow coordinator and asked her to provide her account of the conversation that she had had with A.S. that morning. The caseflow coordinator stated: "I told her that I had just come from a meeting between the judge and all of the attorneys and they discussed her situation and the judge asked that I call to tell her that her jury service has been completed . . . and we understand and that's

when she became agitated because she really wanted to be here." Following these accounts, the state argued that A.S. could not continue to serve as a juror after having been excused. Defense counsel disagreed, asserting that A.S. had not actually been excused because the court's decision to excuse her had not been implemented and A.S. did not recall being told that she had been excused. Ultimately, the court concluded that A.S. had been excused, pointing to the facts that the court had made a ruling excusing her, it had articulated the basis for that decision, and the caseflow coordinator had informed A.S. that her service had ended. The trial court further concluded that, consistent with principles articulated by this court in cases addressing analogous circumstances, once A.S. had been excused, she could not continue to serve as a juror.

With these facts in mind, we turn to the defendant's claim that the trial court improperly dismissed A.S. This claim requires us to examine the trial court's decisions at two points in time: first, when the court decided to excuse A.S., and, second, when the court determined that its earlier decision barred A.S.'s continued service.

Under settled principles, "[a] court may excuse a regular juror if that juror, for any reason, becomes unable to perform his or her duty. General Statutes § 54-82h (c). The power to excuse a juror under this section is expressly premised on a finding of cause. . . . Whether in the circumstances just cause exists to excuse a juror is a matter within the discretion of the . . . court." (Internal quotation marks omitted.) *State v. Banks*, 117 Conn. App. 102, 111–12, 978 A.2d 519, cert. denied, 294 Conn. 905, 982 A.2d 1081 (2009).

The trial court articulated the basis of its initial decision to excuse A.S.: she was ill; unable to confirm when she would be well enough to return, and still potentially infectious; and a delay risked the loss of other jurors

due to the trial having already exceeded its projected completion date. We conclude that this decision was well founded, and therefore cannot be deemed an abuse of discretion.

As the defendant properly points out, however, the trial court initially was willing to reconsider that decision once A.S. indicated that she was well enough to continue but ultimately determined that it could not do so because A.S.'s legal status as a juror had terminated after a decision to excuse her had been made and communicated to her. Whether that conclusion was proper presents a question of law subject to plenary review. Cf. *State* v. *Colon*, 272 Conn. 106, 282, 864 A.2d 666 (2004) ("the authority of the trial court to reassemble the jury and the determination of whether the jury was discharged present questions of law over which our review is plenary"), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005). Although this specific issue is one of first impression, we are not writing entirely on a blank slate. Our case law addressing the dismissal of alternate jurors and the discharge of a jury substantially informs our conclusion.

In *State* v. *Murray*, 254 Conn. 472, 483–84, 757 A.2d 578 (2000), this court addressed the question of whether the version of § 54-82h (c) then in effect, which provided that an alternate juror "shall be dismissed from further service on said case" when the case is given to the regular panel for deliberation; General Statutes (Rev. to 1999) § 54-82h (c); allowed the substitution of an alternate juror once deliberations had commenced. Although the analysis centered on the question of legislative intent; *State* v. *Murray*, supra, 487–95; this court also considered the facts that render a juror dismissed and the legal effect of such an action. Specifically, the court noted: "Our conclusion that § 54-82h (c) does not permit the mid-deliberation substitution of an alternate juror is consistent with our recent holding in *State* v.

*Pare*, [253 Conn. 611, 627–34, 755 A.2d 180 (2000)], wherein we discussed the formal status of a jury in the course of construing the term 'discharge' as used in Practice Book § 42-31. In that case, we held that members of a jury are not necessarily relieved of their official obligations after they have departed from the courtroom and therefore, under certain circumstances, may be recalled for the purpose of submitting to a jury poll. Id., 629. In other words, *Pare* stands for the proposition that mere departure from the courtroom does not, in and of itself, discharge a jury from its obligation to render continued service in a particular case. In *Pare*, we went on to discuss when the obligations accompanying jury service are deemed complete, such that a jury is no longer subject to the authority of the court. We concluded that a jury completes its task, and thereby relinquishes its status as a judicial body, upon the separation and dispersal of its individual members. Id., 634. 'When a jury remains as an undispersed unit within the control of the court and with no opportunity to mingle with or discuss the case with others, it is undischarged and may be recalled.' . . . Id., 630 . . . . After separating and dispersing, however, individual jurors may 'come into contact with outside influences' . . . [id.], 632–33; thereby tarnishing the deliberations that might take place thereafter. *At that point, individual jurors effectively relinquish their status as jurors because they are no longer eligible to be recalled.* See id. *Similarly, absent some statutory authority to the contrary;* see [Public Acts 2000, No. 00-116, § 6];[1] *an alternate juror who has been discharged is, simply stated, no longer a juror. Because that individual is no longer subject to the supervisory authority of the trial court, having been dismissed from service, he or she is sus-*

---

[1] Public Act 00-116, § 6, amended § 54-82h (c) to provide, inter alia, that, once deliberations have begun, alternate jurors either may be dismissed from further service or "may remain in service under the direction of the court."

ceptible to contact with improper outside influences, and therefore, is no longer capable of serving in an official capacity. . . . At that point, the alternate can no longer replace a regular juror who, for whatever reason, has been excused from the case." (Citations omitted; emphasis added.) *State* v. *Murray*, supra, 495–96.

We conclude that this reasoning applies to the present case. Because the trial court properly excused A.S. for adequate cause, once the trial court communicated that decision to her at her home, A.S. "lost her status as a juror [and] it necessarily follows that [she] was no longer qualified to participate in the remainder of the proceedings." Id., 498.

The defendant attempts to distinguish the present case from *Murray* and *Pare* by emphasizing the fact that A.S. indicated that she was uncertain whether the court only was "thinking about" excusing her and therefore would have believed that she still was under the direction and control of the court. Thus, in the defendant's view, not only was A.S. not excused, but, because she still believed that she might continue serving as a juror, she was not subject to the risks articulated in *Murray* and *Pare*.

We disagree with the defendant's reasoning as both a matter of fact and law. The trial court made a finding that A.S. had been excused after crediting the caseflow coordinator's representation that she had told A.S. that the court "asked that I call to tell her that her jury service *has been completed.*" (Emphasis added.) Once that final decision had been communicated to A.S., she no longer was a juror. We are not inclined to adopt the essentially case-by-case approach advocated by the defendant wherein the courts would consider the subjective belief of the excused juror or conduct an inquiry to determine whether, following communication excus-

ing her, the juror had had contact with improper outside influences. Indeed, in *Murray*, this court determined that the alternate jurors no longer were eligible to serve despite the fact that the trial court had not formally dismissed them, but merely had sent them home; *State v. Murray*, supra, 254 Conn. 484 and n.6; and the court had questioned them to ensure that they had not discussed the case with anyone.[2] Id., 485; id., 502 (*McDonald, C. J.*, concurring in part and dissenting in part); accord *State* v. *Cummings*, 67 Conn. App. 734, 736–37, 789 A.2d 1063 (2002) (relying on holding in *Murray* without giving any weight to fact that alternate juror had been instructed upon dismissal that there was possibility that alternates could be called back to court, had been cautioned not to discuss case until verdict had been rendered and had been substituted later that same day). Accordingly, we conclude that the trial court properly excused A.S. for cause.

## II

The defendant's remaining claims relate to the propriety of certain jury instructions or responses to questions relating to those instructions. We address each claim in turn, mindful of the following standard of review.

"The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a

---

[2] To the extent that the defendant relies on *State* v. *Colon*, supra, 272 Conn. 106, that case is not to the contrary. In *Colon*, this court concluded that the trial court properly could recall the jury to correct the verdict after it was excused and retired to the deliberations room following the verdict. Id., 285–86. In that case, this court relied on the principle that "[w]hen a jury remains as an undispersed unit within the control of the court and *with no opportunity* to mingle with or discuss the case with others, it is undischarged and may be recalled." (Emphasis added; internal quotation marks omitted.) Id., 282. Notably, it was the lack of opportunity for outside influences to taint the process that was the essential point, not whether such outside influences actually had been exerted. It is clear that an objective examination of the facts in the present case yields a different conclusion— A.S. had been excused and was in her home.

way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Citation omitted; internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 360–61, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005).

A

The defendant first contends that his conviction for felony murder must be reversed because the trial court's instructions improperly permitted the jury to find him guilty of that charge if he was vicariously liable for the underlying felony, robbery in the first degree. The defendant does not claim that the trial court improperly instructed the jury that he could be found guilty of the robbery charge as either a principal, accessory or on the basis of vicarious liability in accordance with the *Pinkerton* doctrine.[3] Rather, he claims that the felony murder statute, § 53a-54c, contemplates that a defendant "commits" the underlying felony only when acting as a principal or accessory. The defendant concedes that he did not object to the charge and therefore seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or the plain error doctrine.[4] We

---

[3] See *Pinkerton* v. *United States*, 328 U.S. 640, 647–48, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946); see also *State* v. *Walton*, 227 Conn. 32, 45–46, 630 A.2d 990 (1993) (adopting *Pinkerton* doctrine as matter of state law).

[4] The state does not contend that the defendant waived this, or any other, unpreserved claim of instructional error.

agree that the defendant's unpreserved claim is of constitutional magnitude and therefore he is entitled to *Golding* review; see *State* v. *Coltherst*, 263 Conn. 478, 490, 820 A.2d 1024 (2003); but we conclude that the claim fails on the merits.

This claim largely is controlled by our conclusion in *Coltherst*. In that case, this court held that, because *Pinkerton* liability could be applied to a charge of intentional murder when the defendant had no intent to kill and because intentional murder was a predicate felony to capital felony, a conviction for intentional murder under a theory of *Pinkerton* liability could serve as the predicate to capital felony. Id., 501–502. This court explained: "There is no dispute that the legislature intended that intentional murder would be a predicate for capital felony under [General Statutes § 53a-54b]. Instead, the question before us is whether, as authorized by [General Statutes] § 53a-4, 'the [*Pinkerton*] principle should be recognized as a matter of policy'; *State* v. *Walton*, [227 Conn. 32, 45, 630 A.2d 990 (1993)]; in cases involving intentional murder in which the defendant had no intent to kill. We have concluded in . . . this opinion that it should be, and constitutionally may be, recognized and, therefore, that the defendant properly was convicted of intentional murder. Accordingly, we conclude that the trial court properly instructed the jury that its verdict of guilty on that charge would provide the predicate for criminal liability under § 53a-54b (5)." *State* v. *Coltherst*, supra, 263 Conn. 501–502.

The same logic applies in the present case. Under settled—and undisputed—law, a defendant may be found guilty of robbery on the basis of *Pinkerton* liability. See, e.g., *State* v. *Kerr*, 107 Conn. App. 413, 427–29, 945 A.2d 1004 (robbery in first degree), cert. denied, 287 Conn. 914, 950 A.2d 1290 (2008); *State* v. *Leggett*, 94 Conn. App. 392, 405–407, 892 A.2d 1000 (robbery in second degree), cert. denied, 278 Conn. 911, 899 A.2d

39 (2006). Moreover, there can be no question that the legislature intended robbery to be a predicate felony for purposes of felony murder. Section 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery [or other specified crimes] . . . and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants . . . ." Therefore, the trial court properly could instruct the jury that a verdict of guilty of robbery in the first degree can provide the predicate for criminal liability under § 53a-54c.

Indeed, convicting the defendant of felony murder on the basis of his vicarious liability for the underlying robbery is consistent with the legislature's intent as expressed in § 53a-54c and the principles underlying the *Pinkerton* doctrine. Section 53a-54c reflects a legislative determination that certain crimes, such as robbery, create a foreseeable risk of death to a victim of, or bystander to, the crime and, accordingly, imposes criminal liability not only on the person who caused the death, but also on any other participant to the underlying felony. See *State* v. *Rossi*, 132 Conn. 39, 44, 42 A.2d 354 (1945) ("crimes against the person like robbery . . . are, in common experience, likely to involve danger to life in the event of resistance by the victim or the attempt of the perpetrator to make good his escape and conceal his identity"), overruled in part on other grounds by *State* v. *Tomassi*, 137 Conn. 113, 123, 75 A.2d 67 (1950). Similarly, the *Pinkerton* doctrine embodies this principle of liability for foreseeable consequences of criminal acts. "Under the *Pinkerton* doctrine . . . a conspirator may be held liable for criminal offenses committed by a coconspirator that are within the scope of the conspiracy, are in furtherance of it, and are reasonably foreseeable as a necessary or natural

consequence of the conspiracy. . . . The rationale for the principle is that, when the conspirator [has] played a necessary part in setting in motion a discrete course of criminal conduct, he should be held responsible, within appropriate limits, for the crimes committed as a natural and probable result of that course of conduct." (Internal quotation marks omitted.) *State* v. *Coward*, 292 Conn. 296, 307–308, 972 A.2d 691 (2009).

"We also have concluded, however, that there may be occasions when it would be unreasonable to hold a defendant criminally liable for offenses committed by his coconspirators even though the state has demonstrated technical compliance with the *Pinkerton* rule. . . . For example, a factual scenario may be envisioned in which the nexus between the defendant's role in the conspiracy and the illegal conduct of a coconspirator is so attenuated or remote, notwithstanding the fact that the latter's actions were a natural consequence of the unlawful agreement, that it would be unjust to hold the defendant responsible for the criminal conduct of his coconspirator. In such a case, a *Pinkerton* charge would not be appropriate." (Internal quotation marks omitted.) Id., 309.

In the present case, the defendant does not contend that the evidence precluded the jury from finding that the robbery and murder of Bruno was reasonably foreseeable as a necessary or natural consequence of the conspiracy to rob him. Nor does the defendant contend that the evidence established that his role in the robbery was so attenuated from the murder that it would be unjust to hold him criminally responsible for the actions of Hankerson and Davila in causing Bruno's death. Indeed, the jury reasonably could have credited testimony asserting that the defendant had given Davila the gun that Davila brandished during the robbery and that the defendant did not intervene when Hankerson and Davila struggled with Bruno. Thus, "[w]hen the defen-

dant has played a necessary part in setting in motion a discrete course of criminal conduct . . . he cannot reasonably complain that it is unfair to hold him vicariously liable, under the *Pinkerton* doctrine, for the natural and probable results of that conduct that, although he did not intend, he should have foreseen." (Citation omitted; internal quotation marks omitted.) *State* v. *Coltherst*, supra, 263 Conn. 499.

The defendant's contention that a person "commits" robbery for purposes of felony murder only if that person is a principal or accomplice to the robbery lacks any legal or textual support. Notably, General Statutes § 53a-133 uses that very term when defining robbery: "A person *commits* robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny." (Emphasis added.) As we previously have noted, a defendant may be found guilty of robbery under a *Pinkerton* theory of vicarious liability. Therefore, a guilty verdict on that charge, under whatever theory, means that the defendant has "commit[ted]" robbery, which in turn is a predicate felony for purposes of § 53a-54c.

To the extent that the defendant relies on our reasoning in *State* v. *Patterson*, 276 Conn. 452, 886 A.2d 777 (2005), to yield a different result, his reliance is misplaced. In *Patterson*, the defendant had claimed that the trial court improperly concluded that he was subject to a mandatory five year sentence enhancement pursuant to General Statutes § 53-202k because the jury had failed to make the requisite finding under that statute that he had "used" a firearm during the commission of

the crime of conspiracy to commit murder. Id., 473–74. The state had conceded that the jury made no such finding but had argued that the facts that the jury actually found, namely, that one of the defendant's coconspirators had used a firearm during the commission of the offense, were sufficient to warrant the imposition of a sentence enhancement under § 53-202k. Id., 474. Because this court previously had determined that an unarmed accomplice to a class A, B or C felony may be found to have violated § 53-202k on the basis of his or her accomplice's use of a firearm, the state had argued that this principle should be extended to coconspirators under the *Pinkerton* doctrine. Id., 482. In rejecting that argument, this court principally relied on the fact that, "at the time § 53-202k was enacted in 1993; see Public Acts 1993, No. 93-306, § 9; the *Pinkerton* doctrine of vicarious liability was not well established in our state criminal law. Indeed, this court did not expressly adopt the *Pinkerton* doctrine for purposes of our state criminal law until 1993 . . . the very year that § 53-202k was enacted. Thus, unlike accessorial liability, which, as a common-law and statutory rule, was firmly rooted in this state's criminal jurisprudence prior to the enactment of § 53-202k, *Pinkerton* liability was not an acknowledged part of that body of law when § 53-202k was enacted. Consequently, there is no reason to presume that the legislature contemplated that the *Pinkerton* principle of vicarious liability would apply to § 53-202k." *State* v. *Patterson*, supra, 482–83.

Whatever the merits of this reasoning might be as applied to a sentence enhancement statute, it plainly does not categorically bar the application of *Pinkerton* liability to any substantive offense enacted prior to 1993, such as § 53a-54c. Under such reasoning, *Pinkerton* liability would not apply to our Penal Code, which was codified in 1969; see Public Acts 1969, No. 828; and our case law clearly is to the contrary. See *State* v.

*Walton*, supra, 227 Conn. 44–45 ("Although the *Pinkerton* principle does not appear in haec verba in the [P]enal [C]ode, that lacuna is not determinative in this case, because [General Statutes] § 53a-4 of the code provides: 'The provisions of this chapter shall not be construed as precluding any court from recognizing other principles of criminal liability or other defenses not inconsistent with such provisions.' . . . The issue, therefore, is whether the principle should be recognized as a matter of policy under the circumstances of this case." [Citation omitted.]). Moreover, this court has recognized that "application of the *Pinkerton* principle to a homicide committed in furtherance of a conspiracy has long been part of our jurisprudence. See, e.g., *State* v. *Young*, 191 Conn. 636, 642, 469 A.2d 1189 (1983); *State* v. *McCarthy*, 133 Conn. 171, 173, 49 A.2d 594 (1946); *State* v. *Rossi*, [supra, 132 Conn. 44]. *State* v. *Walton*, supra, [50–51]. Indeed, even prior to *Pinkerton*, we had employed a rule of vicarious criminal liability under which a coconspirator could be held liable for a murder if that crime was the natural and probable consequence of a common plan and was committed while acting in pursuance of, or in furtherance of, the common design. . . . *State* v. *Cots*, 126 Conn. 48, 59, 9 A.2d 138 (1939)." (Internal quotation marks omitted.) *State* v. *Diaz*, 237 Conn. 518, 528–29, 679 A.2d 902 (1996). Accordingly, we conclude that the trial court properly instructed the jury on the felony murder count.

B

The defendant next claims that he was deprived of a fair trial due to the trial court's failure to respond adequately to the jury's request for further instructions on conspiracy to commit robbery in the first degree. Specifically, the defendant contends that, because the trial court merely restated its initial instruction, it failed to comply with Practice Book § 42-27. The defendant concedes that this claim is unpreserved, but seeks *Gold-*

*ing* review or to prevail under the plain error doctrine. We agree that the defendant is entitled to review, but conclude that the record does not establish that the trial court's actions deprived him of a fair trial.

The record reveals the following additional undisputed facts. The trial court provided a written copy of its instructions to the jury. Sixteen pages pertained to count four of the information, conspiracy to commit robbery in the first degree—seven pages specifically related to the elements of conspiracy, and nine pages related to the elements of robbery in the first degree as the crime that was the alleged objective of the conspiracy. On the third day of deliberations, the jury sent out a note that provided: "We are divided on one charge, count [four]. Could you please clarify in [l]ayman's terms [c]onspiracy charge count [four]. If we are deadlocked on one charge, [c]an we still proceed on the other three?"

After discussing the matter with the parties, the court noted on the record that, although this particular instruction was lengthy, the court was "not going to get into what's layman's terms, what's not layman's terms." The court brought the jury in and stated in pertinent part as follows: "I realize that the conspiracy, basically, count four, is a fairly lengthy instruction, but I want to remind you, and you have the jury instructions with you, that § 53a-48a [a] of our statutes provides as follows: A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance to such conspiracy.

"Now, the state must prove the following elements beyond a reasonable doubt: (1) that the defendant intended to commit the crime of robbery in the first

degree, as will be defined and was defined in the instructions; and (2) an agreement with one or more persons to engage in or cause the performance of the crime of robbery in the first degree; and (3) the commission of an overt act in pursuance of the agreement by any one or more of the persons who made the agreement; and obviously, the court further instructed you, explaining in detail not only the elements, but other instructions within count four of the instructions . . . .

"Now, if there is a specific term or section of the instruction that you would want clarified, please write me a note as to what that specific section or part is and I'll do my best, if I can, to respond to that inquiry, that note. . . .

"So, I'm giving you two requests. One is a clarification on what you mean by 'proceed' and then a second clarification or request, if you need it, on what specific section of the count four instruction you would want me to explain or clarify, if I can."

Shortly thereafter, the jury submitted a note to the court in response to what it meant by "proceed" but did not make a request for a specific clarification on the conspiracy count. Later that afternoon, the jury reached its verdict.

Practice Book § 42-27 provides: "If the jury, after retiring for deliberations, requests additional instructions, the judicial authority, after providing notice to the parties and an opportunity for suggestions by counsel, shall recall the jury to the courtroom and give additional instructions necessary to respond properly to the request or to direct the jury's attention to a portion of the original instructions." Although this court has held that "[c]larification of the instructions when the jury or one of its members manifests confusion about the law is mandatory"; (internal quotation marks omitted) *State* v. *Fletcher*, 207 Conn. 191, 193, 540 A.2d 370 (1988);

as § 42-27 clearly indicates, not every such request will require the court to explain its initial instructions in different terms.

We conclude that the trial court did not violate its obligations by declining to rephrase the entire conspiracy instruction in laypersons' terms. Given the length of the instructions, the trial court properly summarized the essential elements of the crime as provided by statute to focus the jury's attention on the appropriate framework for its deliberations and encouraged the jury to submit a note indicating any particular aspect or aspects of the instructions that it wanted clarified. The jury declined to do so, and nothing subsequent to the jury's submission of the note indicates that it was confused about the law. Indeed, the defendant never has contended that these instructions were improper or inherently ambiguous; in fact, the defendant declined to take advantage of § 42-27, which afforded him the opportunity to make specific suggestions in response to the jury's request for additional instructions. Moreover, this is not a case in which the jury sought clarification on a specific legal issue, as in the cases from other jurisdictions on which the defendant relies. See, e.g., *United States* v. *Nunez*, 889 F.2d 1564, 1568 (6th Cir. 1989) (The Court of Appeals concluded that it was improper for the trial court to reiterate the entire conspiracy instruction when the jury sought a clarification as to the specific issue of whether a law enforcement officer could be a coconspirator: "When a jury seeks clarification of particular issues . . . the judge should clear away its difficulties with concrete accuracy. . . . When a jury indicates confusion about an important legal issue, it is not sufficient for the court to rely on more general statements in its prior charge." [Citation omitted; internal quotation marks omitted.]); *State* v. *Bryant*, 5 Kan. App. 2d 114, 115, 612 P.2d 1255 (1980) (concluding that it was improper for trial court to

restate cursory definition of self-defense in response to jury's question as to whether self-defense instruction applied to only defendant, or plaintiff, or both because, "[w]hile [the instruction] accurately states the law of self-defense, standing alone it gives the jury no guidance as to how it is to be applied"). Under the facts of the present case, in the absence of further communication from the jury, the trial court did not abuse its discretion in responding to the jury's request.

C

Finally, we briefly address the defendant's claim that his due process rights were violated because the trial court's instructions on conspiracy to commit robbery in the first degree were misleading. The defendant contends that the instructions improperly permitted the jury to find him guilty on that count if it determined that he had committed either conspiracy to commit robbery in the first degree, a class B felony, or the lesser included offense of conspiracy to commit robbery in the third degree, a class D felony. Compare General Statutes § 53a-134 with General Statutes § 53a-136. He did not take exception to this instruction, but seeks *Golding* review of his claim. We conclude that the defendant cannot prevail on this claim.

As we previously have noted, "the applicable standard of review is whether there is a reasonable possibility that the jury was misled in reaching its verdict." (Internal quotation marks omitted.) *State* v. *Montanez*, 277 Conn. 735, 742, 894 A.2d 928 (2006). We agree with the defendant that the specific language that he has highlighted, read in isolation, suggested that the jury could find him guilty on count four on the basis of robbery in either the first degree or third degree. It is well settled, however, that "[t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and

not critically dissected in a microscopic search for possible error." (Internal quotation marks omitted.) *State v. Peeler*, supra, 271 Conn. 360–61; accord *State v. Heinemann*, 282 Conn. 281, 300, 920 A.2d 278 (2007) ("[t]he charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge" [internal quotation marks omitted]). When considering the instructions in their entirety, it is evident that the court repeatedly directed the jury to return a verdict of guilty on count four only if it concluded that the state had proved beyond a reasonable doubt that the defendant had conspired to commit robbery in the first degree. The jury was to consider conspiracy to commit robbery in the third degree only if it concluded that the defendant was not guilty on count four, conspiracy to commit robbery in the first degree. The jury's affirmative responses to the clerk's question, the collective jury poll and the individual poll, each of which inquired as to the jury's verdict on count four "charging the defendant with conspiracy to commit robbery in the *first* degree"; (emphasis added); further underscore that the jury reasonably could not have found the defendant guilty on that count on the basis of conspiracy to commit robbery in the third degree.

The judgment is affirmed.

In this opinion the other justices concurred.