******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* MIGUEL GONZALEZ
(SC 18927)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald,
Espinosa and Robinson, Js.

*Argued September 19, 2014—officially released February 24, 2015*

*Lisa J. Steele*, assigned counsel, for the appellant
(defendant).

*Matthew A. Weiner*, deputy assistant state's attorney,
with whom, on the brief, were *John C. Smriga*, state's
attorney, and *Joseph J. Harry*, senior assistant state's
attorney, for the appellee (state).

*Opinion*

ZARELLA, J. The defendant, Miguel Gonzalez, appeals from the judgment of conviction, rendered after a jury trial, of one count of murder in violation of General Statutes § 53a-54a (a). On appeal, the defendant urges us to overturn his conviction and to remand the case for a new trial on the grounds that the trial court abused its discretion and violated his constitutional right to a trial by an impartial jury by excusing a juror for injecting extraneous matters into deliberations and for refusing to deliberate. The defendant further claims that the trial court abused its discretion by excusing a second juror who was absent for one day for a medical reason without inquiring how long she would be unavailable, denying the defendant's motions for a mistrial after excusing the two jurors, and allowing into evidence, as proof of consciousness of guilt, testimony and a video recording relating to the defendant's refusal to cooperate with the police as they were taking a buccal swab sample from him. We reject the defendant's claims and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In late September, 2007, the defendant was involved in an altercation with Miguel Vazquez outside a bar in the city of Bridgeport. Two weeks later, Vazquez was with two of his nieces, Erica Ortiz (Erica) and Nairobi Ortiz (Nairobi), at the same bar when he encountered the defendant again. Erica and Nairobi both noticed that the defendant was staring at Vazquez from across the bar. Vazquez and his nieces then left the bar for a house party in Bridgeport, attended by approximately thirty people in the basement of the house. Later that night, when Erica and Nairobi saw the defendant arrive at the house party, they noticed that Vazquez' demeanor changed and that he looked "worried." Before they left the party, Erica and Nairobi also observed the defendant and Vazquez briefly interact with one another in the basement.

After Erica and Nairobi left, Vazquez was shot and killed near a stairwell leading into the basement where the party was being held. Although there were no eyewitnesses to the shooting, partygoers heard gunshots coming from the basement of the house. An initial investigation into the shooting proved fruitless, as many of the people at the house were unwilling to speak with the police. During a subsequent investigation, however, Richard Serano told the police that, as he was arriving at the party, he saw the defendant leaving and that the defendant was holding a handgun and shouting at onlookers that he would kill them if they said anything about what they had seen. Serano also told the police that, in the months after the shooting, the defendant threatened to kill him multiple times if he said anything about the incident.

During their investigation, the police recovered a baseball hat and a pair of glasses from the basement in which the defendant and Vazquez had been before Vasquez was shot. Both Erica and Nairobi had seen the defendant wearing a similar hat and pair of glasses the night Vazquez was killed but before the shooting occurred. Serano told the police that the defendant had not been wearing a hat or glasses when he saw the defendant leaving the party. The police thus obtained a warrant to take a buccal swab sample from the defendant to determine whether the defendant's DNA was present on the hat or glasses.

The police presented the defendant with the warrant while he was in custody for an unrelated incident, but the defendant refused to cooperate and requested an attorney. After unsuccessfully attempting to coax the defendant into cooperating, the police held the defendant down and took the swab sample by force.[1] Subsequent DNA testing indicated that the defendant was a possible contributor to the DNA on the hat in question but not to the DNA on the glasses. The defendant ultimately was arrested and charged with murder in connection with the killing of Vazquez.[2]

A jury trial was held in the fall of 2011. One of the detectives who was present when the buccal swab sample was taken from the defendant testified that the defendant had refused to cooperate with the police when they tried to take the sample. During the detective's testimony, the state also offered a video recording of the incident that showed the defendant refusing to comply with the officers' request for the swab sample. The trial court allowed into evidence the detective's testimony and, over the objection of defense counsel, the video recording as evidence of the defendant's consciousness of guilt.

On the eighth day of jury deliberations, one of the jurors accused the foreperson, Q.A.,[3] of refusing to deliberate in good faith. The trial court investigated the allegations by canvassing each juror, including Q.A., and ultimately decided to excuse Q.A. and to replace her with an alternate juror on the grounds that Q.A. had injected into deliberations extraneous matters and had refused to deliberate in good faith. Defense counsel objected to the trial court's decision to excuse Q.A., and the defendant filed a motion for a mistrial, which the trial court denied. On the same day, a different juror, C.S., called the court clerk to report that she would be absent due to a medical condition.[4] The trial court indicated that it was inclined to excuse C.S. in addition to Q.A. and, over defense counsel's objection, replaced C.S. with another alternate juror. The defendant also moved for a mistrial on the basis of the trial court's decision to excuse C.S., but the trial court denied that motion as well.

The reconstituted jury deliberated for four days before finding the defendant guilty of murder.[5] The trial court then rendered judgment in accordance with the jury verdict and sentenced the defendant to fifty years incarceration. This direct appeal followed.

I

The defendant first claims that the trial court abused its discretion and violated his constitutional right to a trial by an impartial jury when it excused Q.A. The defendant does not challenge the trial court's factual findings regarding Q.A.'s conduct. Rather, the defendant argues that the trial court failed to apply the proper standards in deciding whether to excuse Q.A. With respect to the first basis on which the trial court excused Q.A., her injection of extraneous matters into deliberations, the defendant argues that Q.A.'s conduct was not improper and, further, that the trial court should not have excused Q.A. unless that misconduct compromised her ability to deliberate fairly. With respect to the second basis on which the trial court excused Q.A., her refusal to deliberate in good faith, the defendant argues that the trial court should not have excused Q.A. without first applying a "heightened" standard to ensure that there was no reasonable possibility that Q.A. was being excused because of her views regarding the merits of the case. The state responds that the trial court had just cause to excuse Q.A., that the trial court was not required to apply the standards the defendant urges, with respect to both of the grounds on which she was excused, and that, even if those standards applied, excusing Q.A. was nevertheless proper. We conclude that the trial court did not abuse its discretion or violate the defendant's constitutional right to a trial by an impartial jury in excusing Q.A.

The following additional facts relating to the jury's deliberations are pertinent to this claim. On the fourth day of deliberations, the jury sent the trial court a note stating that it was "struggling to come to [a] con[sensus]" and asking to be reinstructed on reasonable doubt and making inferences. On the fifth day of deliberations, discord appeared to be growing among the jurors when one juror asked the court clerk whether they could "get rid of" the foreperson. The following day, the jury sent the trial court a note stating: "We are not able to come to one decision." In response, the trial court gave the jury a Chip Smith instruction,[6] after which the jury resumed deliberations. One day later, the trial court suspended deliberations when Q.A. lost her voice and was physically unable to speak. When the jury returned the following day, the eighth day of deliberations, one of the jurors, A.N., sent the trial court a note stating: "It is the opinion of several jurors that one juror is not deliberating in good faith. We appear to be at an impasse."

To investigate A.N.'s allegations, the trial court decided to interview each juror separately in the presence of counsel. Before questioning each juror, however, the trial court cautioned the juror not to reveal anything about the substance of the deliberations or whether there were any voting blocs within the jury. The trial court began with A.N., who identified Q.A. as the juror he believed was not deliberating in good faith. A.N. accused Q.A. of "argu[ing] facts that never came— argu[ing] suppositions, I should say, that never came into evidence during the trial." When the trial court asked A.N. to describe in general terms the extrinsic evidence Q.A. had raised during deliberations, A.N. stated that Q.A. had suggested that witnesses who testified at trial had been bribed. A.N. also complained that Q.A. kept changing her argument and her views on what evidence she found credible.

The trial court then proceeded to carefully interview the ten remaining jurors, other than Q.A. All ten jurors unanimously agreed that one of the jurors was not meaningfully or reasonably participating in deliberations, and all ten independently identified Q.A. as that juror. At least seven of those ten jurors specifically stated that Q.A. was refusing to speak to the other jurors, and five jurors indicated that Q.A. was refusing to sit at the table with them in order to participate in deliberations. One juror noted that Q.A. had stated, "I don't have to share my opinions," and another juror noted that Q.A. had also stated, "I'm just here to observe . . . ." A different juror explained that she thought Q.A. had been communicating, but only in short responses to other jurors' questions. Yet another juror added that she thought that Q.A. had "said what she wants to say, and she's got her opinion, and she's done with deliberating," whereas a different juror testified: "I don't think she's deliberating in good faith . . . . It's not because I think she agrees or disagrees with anybody, so that's not where I'm coming from with that. I just think that she's not . . . participating." Similarly, another juror testified that, "[r]egardless of the arguments being made, regardless of the discussion being made, [Q.A.] shuts down. . . . It's a wall that we can't get around." One of the jurors suggested that Q.A. had only "recently" withdrawn from participating in the deliberations.

Although the majority of the jurors' complaints about Q.A. centered on her lack of participation in the deliberations, a few jurors also complained to the trial court about the arguments Q.A. had made during deliberations and her reasons, or lack thereof, for them. For instance, one juror noted, as had A.N., that Q.A. kept changing her argument over the course of deliberations. A different juror stated that "the case that [Q.A.] makes is . . . weak at best." Finally, another juror explained that "[Q.A.'s] opinion is what she's feeling, and [the

other jurors] want more. . . . [Q.A. is] not giving them more . . . [as to] why she feels the way she feels . . . ." None of the jurors other than A.N. alleged that Q.A. had suggested that witnesses had been bribed.

To conclude its investigation, the trial court interviewed Q.A., who denied that she was refusing to participate in deliberations. Q.A. described the deliberations as "intense," and stated: "I think we're kind of at a point where one is not listening to the other because one is not giving the answers that the others want to accept." With respect to the bribery allegations, Q.A. explained: "A question was asked of me, what would an individual have gotten out of being a witness? And my response was, I don't know. I don't know. I can't tell you. So, a question was then [posed]; do you believe there was— and I said, I never said that." When the trial court asked Q.A. if she thought that witnesses had been bribed, Q.A. stated, "I said, no, I don't believe there was. But I don't know what someone would get out of being a witness."

During the trial court's interviews with the twelve jurors, none of them indicated an inclination to convict or acquit. One juror, however, suggested that a majority of jurors had agreed on a verdict by stating that Q.A. was "[n]ot responding . . . when the people try to have [an] open discussion as [to] what they're—most of the people are feeling." That juror did not indicate, however, in which direction "most of the people" were inclined to vote.

After interviewing each juror and hearing arguments from counsel, the trial court decided to excuse Q.A. for two reasons. First, the court excused Q.A. because it found that she had refused to participate in deliberations. In making this finding, the trial court explained: "[Eleven] jurors were absolutely consistent that [Q.A.] was in fact not deliberating. . . . That is different from a juror who has reasonably participated in the deliberations and has an opinion that is fixed, and [he or she] will go no further. . . . [T]he court is persuaded [by] their claims that she shut down, that she refused to discuss things, that she refused to give her opinions . . . [and] they were uniformly consistent that she had essentially shut herself down and would not deliberate."

The second reason the trial court gave for excusing Q.A. was that it found that Q.A. had injected into deliberations "a matter that was outside the evidence, something that was based on conjecture or suspicion," by suggesting that witnesses had been bribed. In recounting A.N.'s testimony regarding Q.A., the trial court stated: "Twice, [A.N.] corrected me to be clear . . . that [Q.A.] had said that [witnesses] had been bribed, not may have been, but [that] they had been." Although Q.A. denied having made such statements, the trial court discredited her testimony, stating: "I thought [Q.A.'s] testimony on that point . . . when confronted with what another juror had said—I thought her testi-

mony on that, her quick recollection of the colloquy and her explanation of—I've got to say I thought were disingenuous. I really thought it was a contrived response. . . . And, to me, she was not credible on that point. . . . I found much more credible the testimony of [A.N.], who was clear to me twice that it had occurred. I believe in sum, then, that [Q.A.] has not conducted her deliberations in accordance with the court's instructions . . . ." After making these findings, the trial court excused Q.A. from the jury.

After it decided to excuse Q.A. but before replacing Q.A. with an alternate juror and proceeding with deliberations, the trial court separately interviewed each of the remaining jurors, except C.S., who was absent for a medical reason. The trial court asked them whether they were willing and able to begin deliberations anew, as is required by General Statutes § 54-82h (c),[7] the statute permitting the substitution of alternate jurors in criminal cases. Each juror confirmed that he or she was able to do so. The trial court then canvassed two alternate jurors to ensure that they had abided by the court's instructions since the end of the trial and were still able to serve as jurors. Finally, the trial court replaced Q.A. with an alternate juror[8] and instructed the reconstituted jury that it must disregard any prior deliberations and begin them anew.

A

We begin with the defendant's claim that the trial court improperly excused Q.A. for injecting extraneous matters into deliberations. The defendant argues that, even if Q.A. suggested that witnesses had been bribed, the trial court was not justified in excusing her. The defendant contends that, in making those comments, Q.A. was not impermissibly considering matters outside of the evidence but, rather, was relying on her common sense and life experience to evaluate the evidence and to make credibility determinations about witnesses. Alternatively, the defendant claims that the trial court failed to apply the correct evidentiary standard before excusing Q.A. Specifically, the defendant claims that, before excusing Q.A., the trial court should have determined whether her misconduct affected her ability to deliberate impartially. We conclude that the defendant's claims are without merit and that the trial court did not abuse its discretion in excusing Q.A. for considering matters extraneous to the evidence presented at trial.

Our standard of review for a trial court's decision to excuse a juror is well established. Section 54-82h (c) permits trial courts to excuse a juror "[i]f, at any time, any juror shall, for any reason, become unable to further perform [his or her] duty . . . ." "The power to excuse a juror under this section is expressly premised on a finding of cause. . . . Whether in the circumstances just cause exists to excuse a juror is a matter within the discretion of the . . . court." (Internal quotation

marks omitted.) *State* v. *Apodaca*, 303 Conn. 378, 386, 33 A.3d 224 (2012); see also *State* v. *Cubano*, 203 Conn. 81, 88–89, 523 A.2d 495 (1987) ("[t]he trial court is vested with wide discretion in determining the competency of jurors to serve, and that judgment will not be disturbed absent a showing of an abuse of discretion").

"Consideration of extrinsic evidence is jur[or] misconduct . . . . The modern jury's verdict must be based solely upon the evidence developed at the trial." (Citations omitted.) *State* v. *McCall*, 187 Conn. 73, 80, 444 A.2d 896 (1982), citing *Irving* v. *Dowd*, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961); see also 75B Am. Jur. 2d 78–79, Trial § 1305 (2007). Indeed, every juror who serves on a jury in a criminal trial in Connecticut swears under oath or assents by affirmation to base the verdict on the evidence presented at trial. See General Statutes §§ 1-23 and 1-25. In the present case, the trial court instructed the jurors to base their verdict solely on the evidence presented at trial. "A juror is expected to draw upon his general knowledge and experience in deciding the case, and he is encouraged to participate in full and robust debate and deliberations with his fellows in reaching a verdict. However, he should not consider facts relating to the case unless introduced at trial under constitutional and legal safeguards . . . ." (Internal quotation marks omitted.) *State* v. *Asherman*, 193 Conn. 695, 739, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). A trial court may, in its discretion, excuse a juror who considers during deliberations facts that were not presented at trial. See id., 740 (concluding that it was inappropriate for juror to bring belt and shirt into jury room to conduct experiment); see also *United States* v. *Ebron*, 683 F.3d 105, 127–28 (5th Cir. 2012) (District Court did not abuse its discretion in excusing juror on basis of her lack of candor and failure to abide by court's instructions), cert. denied,      U.S.    , 134 S. Ct. 512, 187 L. Ed. 2d 365 (2013); *State* v. *Mills*, 57 Conn. App. 356, 364–65, 748 A.2d 891 (2000) (trial court properly excused juror who could not guarantee that he would not rely on his specialized knowledge during deliberations).

Applying these principles to the present case, we conclude that the trial court did not abuse its discretion in excusing Q.A. for suggesting that witnesses had been bribed. Although Q.A. denied making such a suggestion, the trial court acted within its authority in concluding that her denial was not credible and in crediting A.N.'s statement that Q.A. had done so. At no point during the trial did a party introduce evidence to indicate that any of the witnesses had been bribed. Thus, by suggesting that witnesses had been bribed, Q.A. violated her oath and the trial court's instructions to base her verdict solely on the evidence presented at trial. In making those comments, Q.A. was not drawing from her general knowledge and experience to evaluate the

evidence, which is permissible; rather, she was purporting to have specific knowledge about the individuals who testified at trial that could have come only from an outside source. This was plainly improper and constituted cause to excuse Q.A.[9] Excusing Q.A. on this basis was therefore within the trial court's sound discretion.

We also reject the defendant's claim that the trial court failed to apply the proper standard in excusing Q.A. for considering extraneous matters. The defendant argues that the trial court should have applied a standard similar to that recognized in *State* v. *Depaz*, 165 Wn. 2d 842, 204 P.3d 217 (2009), which held that, when a trial court is aware that a juror is a holdout, it should not excuse the juror for engaging in misconduct if the juror can still deliberate fairly despite the misconduct. See id., 857. The Washington Supreme Court expressly limited this standard, however, to cases in which "the trial court has knowledge of [the] deliberating juror's substantive opinion of the case . . . ." Id. In the present case, the trial court had no knowledge of Q.A.'s or any other juror's substantive opinion about the case, due to the extensive precautions that the court took when interviewing the jurors, and there is little evidence in the record, if any, that Q.A. was a holdout juror. Thus, such a standard would have been inapplicable in the present case.

In arguing that the trial court should have applied a different standard in excusing Q.A., the defendant also relies on cases standing for the proposition that a trial court need not dismiss a juror for misconduct unless the defendant establishes that he or she has been prejudiced by the misconduct. See, e.g., *State* v. *Asherman*, supra, 193 Conn. 736. This principle does not control the present case, however, because it does not *prevent* a trial court from removing a juror in its discretion for engaging in nonprejudicial misconduct. Instead, it merely establishes that, when a trial court has declined to remove a juror for engaging in misconduct, and that misconduct was not prejudicial to the defendant, a defendant is not entitled to have his or her conviction reversed. For the foregoing reasons, we conclude that the trial court was not required to apply a different standard before excusing Q.A. and that it did not abuse its discretion in excusing Q.A. for injecting extraneous matters into deliberations.

B

The defendant's second claim with respect to the trial court's decision to excuse Q.A. is that the trial court failed to apply a "heightened" evidentiary standard in deciding whether to excuse Q.A. for refusing to deliberate.[10] Specifically, the defendant argues that Q.A. was, in fact, a holdout juror and that, before excusing Q.A., the trial court should have determined whether there was any reasonable possibility that the allegations

against her actually stemmed from the other jurors' disagreement with Q.A. over the merits of the case. In other words, the defendant argues that the trial court should have first determined whether the other jurors accused Q.A. of refusing to deliberate in good faith because they disagreed with Q.A. regarding the defendant's guilt, and, if so, the trial court should not have excused Q.A. Although the defendant concedes that the trial court was not required to make such a determination under Connecticut law, he urges us to adopt such a rule, as some other jurisdictions have done. The defendant relies primarily on a line of federal circuit court cases applying some variant of this standard. See, e.g., *United States* v. *Symington*, 195 F.3d 1080, 1087 (9th Cir. 1999); *United States* v. *Thomas*, 116 F.3d 606, 621–24 (2d Cir. 1997); *United States* v. *Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987). We conclude that it is not necessary to decide what standard would apply in the present case because the trial court excused Q.A. not only for refusing to deliberate in good faith, but also for considering matters not in evidence, a ground that was independent of Q.A.'s refusal to deliberate.[11] Because we upheld the trial court's decision to excuse Q.A. on the basis that she considered matters not in evidence; see part I A of this opinion; we need not reach the defendant's claim regarding the trial court's decision to excuse Q.A. for refusing to deliberate.

## II

The defendant next claims that the trial court abused its discretion when it excused C.S. and replaced her with an alternate juror when C.S. was absent for one day due to a medical issue. The defendant concedes that a trial court may excuse a juror who will be absent for an extended period of time due to illness but argues that, in this case, the trial court committed reversible error by excusing C.S. without knowing how long C.S. would be absent or investigating the specific reason she was absent. We disagree and conclude that the trial court did not abuse its discretion in excusing C.S.

The following additional facts, which are undisputed, are relevant to our resolution of this issue. On the same day that the trial court excused Q.A., which was a Friday, C.S. called the court clerk "to report a medical condition that would make her unavailable, at least [for that day]." At that point, the jury had deliberated for eight days, but deliberations had been suspended for the prior two days. Q.A. had lost her voice on Wednesday, the trial court had spent Thursday investigating Q.A.'s alleged misconduct, and, on Friday morning, the court finished its investigation and hearing arguments from counsel about whether to excuse Q.A. It had been sixteen days, including weekends and days off from deliberations, since the close of evidence and twenty-six days since the trial had begun. The trial court thus indicated that, "under all of these circumstances," it

intended to replace C.S. at the same time it was replacing Q.A., as long as the alternate jurors were still fit to serve and the remaining jurors were willing to begin deliberations anew. As we previously discussed, the trial court canvassed each of the alternate and remaining jurors and confirmed that they were able and willing to begin deliberations anew. The trial court then excused C.S., over the objection of defense counsel, denied the defendant's motion for a mistrial, and replaced C.S. with an alternate juror. The reconstituted jury subsequently found the defendant guilty after deliberating for four days.

As we noted in part I A of this opinion, we review a trial court's decision to excuse a juror pursuant to § 54-82h (c) for abuse of discretion. See, e.g., *State* v. *Apodaca*, supra, 303 Conn. 386. We have recognized that unavailability due to illness may constitute cause to excuse a juror. See id., 386–87 (trial court's decision to excuse juror who was ill with flu and unable to confirm when she would return was not abuse of discretion).

In the present case, we cannot say that the trial court abused its discretion in excusing C.S. from the jury when she reported that she would be unavailable for at least one day. The trial court excused C.S. on the basis of all of the circumstances surrounding the trial and the deliberations up to that point, and, in light of those specific circumstances, we conclude that the trial court was justified in excusing C.S. When the trial court excused C.S., it had been twenty-six days since the trial had started. At that point, the jury's deliberations had been suspended for the prior two days because Q.A. lost her voice and had engaged in misconduct. If the trial court had suspended deliberations again on the Friday that C.S. was absent, deliberations would have resumed at the earliest on the following Monday, five days after deliberations were first interrupted.

We note, however, that the trial court's decision to excuse C.S. was at the outer limits of its discretion. Arguably, the most critical fact justifying the trial court's decision is that, on the day C.S. was absent, the trial court had excused Q.A. The jury was thus forced to begin deliberations anew, regardless of whether the trial court excused C.S. or waited to see if she could return. If the trial court had not excused Q.A., then it could have suspended deliberations on that Friday to see if C.S. was able to return the following Monday, in which case the jury could have resumed its deliberations where it previously had left off. Because the trial court already had excused Q.A., and it therefore was impossible to avoid beginning deliberations anew, excusing C.S. did not carry the burden of restarting deliberations that usually accompanies the replacement of an excused juror.

If the trial court had not already excused Q.A., we seriously doubt that it would have been proper to

excuse C.S. the Friday she was absent, forcing deliberations to begin anew instead of suspending deliberations at least one day to see if C.S. returned the following Monday. In light of all the circumstances surrounding the trial court's decision to excuse C.S., however, we conclude that the court did not abuse its discretion in excusing C.S.

We reject the defendant's contention that the trial court lacked sufficient information to find that C.S. was unable to perform her duty as a juror, as required by § 54-82h (c). In making this argument, the defendant relies on a string of federal cases standing for the proposition that it is an abuse of discretion to excuse a juror who will be unavailable for only a short time. See, e.g., *United States* v. *Araujo*, 62 F.3d 930, 936–37 (7th Cir. 1995). These cases, however, are of limited usefulness in deciding the present appeal because the excused juror in each case was not replaced by an alternate juror, and the matter in each case subsequently was tried to a jury of eleven rather than twelve. In contrast, the defendant in the present case was found guilty by the reconstituted jury of twelve after the court replaced both Q.A. and C.S. with alternate jurors, which relieved any concerns about the defendant being denied his right to a unanimous verdict by an impartial jury. The defendant cites no other authority to support his contention that trial courts are barred from excusing a juror who is unavailable only for a short period of time, and we decline to impose such a limitation on a trial court's discretion. Thus, we conclude that the trial court did not abuse its discretion in excusing C.S. from the jury.

### III

The defendant further claims that the trial court abused its discretion in denying his motions for a mistrial after the court excused Q.A. and C.S. The defendant contends that replacing Q.A. and C.S. with alternate jurors instead of declaring a mistrial was reversible error because the jury was "obviously deadlocked . . . ." We disagree.

As we previously discussed, the jury appeared to disagree initially over the verdict before the trial court excused Q.A. and C.S. The jury deliberated for four days before sending the trial court a note stating that it was "struggling to come to [a] con[sensus]" and asking to be reinstructed on reasonable doubt and making inferences. Over the course of the following two days, one of the jurors asked the clerk whether they could "get rid of" the foreperson, and the jury sent another note to the trial court stating, "[w]e are not able to come to one decision." The jury continued to deliberate, however, after the trial court gave the jury a Chip Smith instruction. The trial court suspended deliberations when Q.A. lost her voice, and, one day later, the allegations of Q.A.'s misconduct emerged. After an investigation, in which all eleven other jurors independently

identified Q.A. as the juror who had refused to partici-
pate in deliberations, the trial court excused Q.A.

The defendant moved for a mistrial on three separate
occasions, and the trial court denied all three motions.[12]
The defendant first filed a written motion for a mistrial
after the court interviewed the eleven jurors other than
Q.A. In this motion, the defendant requested that the
court declare a mistrial rather than excuse Q.A. and
replace her with an alternate juror. The defendant
argued that the trial court should declare a mistrial
because the jury was deadlocked and because the
court's canvassing of the jury would make it impossible
for a reconstituted jury to begin deliberations anew,
thereby violating the defendant's right to a unanimous
verdict by an impartial jury. Later that same day,
defense counsel, on behalf of the defendant, orally
moved for a mistrial when the trial court indicated that
it was going to excuse C.S. and replace her with an
alternate juror. At that time, defense counsel stated that
he objected not only to the trial court's decision to
excuse C.S., but also "to the . . . whole procedure"
the court had used in canvassing the jurors. Three days
after the trial court excused Q.A. and C.S., the defendant
renewed his motion for a mistrial on the basis that the
local media had published a newspaper article in which
Q.A. claimed that other jurors had attempted to intimi-
date her because they did not agree with how she
viewed the case. The defendant now claims that it was
"evident" that the jury was deadlocked and that the
trial court abused its discretion in declining to declare
a mistrial and in replacing Q.A. and C.S. with alter-
nate jurors.

We review a trial court's decision to grant or deny a
motion for a mistrial for abuse of discretion. See, e.g.,
*State* v. *Ortiz*, 280 Conn. 686, 702, 911 A.2d 1055 (2006).
"While the remedy of a mistrial is permitted under the
rules of practice, it is not favored. [A] mistrial should
be granted only as a result of some occurrence upon
the trial of such a character that it is apparent to the
court that because of it a party cannot have a fair trial
. . . and the whole proceedings are vitiated. . . . If
curative action can obviate the prejudice, the drastic
remedy of a mistrial should be avoided. . . . On
appeal, we hesitate to disturb a decision not to declare
a mistrial. The trial judge is the arbiter of the many
circumstances which may arise during the trial in which
his function is to assure a fair and just outcome. . . .
The trial court is better positioned than we are to evalu-
ate in the first instance whether a certain occurrence
is prejudicial to the defendant and, if so, what remedy
is necessary to cure that prejudice. . . . The decision
whether to grant a mistrial is within the sound discre-
tion of the trial court." (Internal quotation marks omit-
ted.) Id.

We conclude that the trial court did not abuse its

discretion in denying the defendant's motions for a mistrial. As a threshold matter, we reject the defendant's contention that the jury was "obviously" deadlocked at any point. As we previously discussed, there is no evidence in the record of any of the jurors' views on the merits of the case, or whether there were any voting blocs within the jury. See part I A of this opinion. The fact that the jury reported that it was "struggling" to come to a consensus, and then reported that it was not able to come to "one decision," does not necessarily mean that the jury was deadlocked. The trial court's findings indicate that the more likely explanation for the jury's difficulty in coming to a unanimous verdict was the fact that Q.A. was refusing to participate in deliberations. The defendant's claim that the jury was deadlocked is therefore entirely speculative.

Moreover, the defendant cites no authority in support of his claim that the trial court was required to declare a mistrial under the facts of the present case. Trial courts are not required to declare a mistrial when a jury has deliberated for a certain number of days without reaching a verdict, nor are they always required to declare a mistrial when a juror engages in misconduct. Rather, when faced with a juror's violation of instructions, trial courts exercise their discretion in determining whether a jury is capable of disregarding a juror's misconduct and beginning deliberations anew. In the present case, the trial court made exactly that judgment after investigating the scope of Q.A.'s misconduct and the willingness of the other jurors to begin deliberations anew. Excusing Q.A. and replacing her with an alternate juror instead of declaring a mistrial was within the trial court's sound discretion. See *United States* v. *Ronda*, 455 F.3d 1273, 1299–1301 (11th Cir. 2006) (District Court did not abuse its discretion in denying motions for mistrial after excusing two jurors who introduced extraneous information into deliberations), cert. denied sub nom. *Aguero* v. *United States*, 549 U.S. 1212, 127 S. Ct. 1327, 167 L. Ed. 2d 86 (2007), and cert. denied sub nom. *Beguiristain* v. *United States*, 549 U.S. 1212, 127 S. Ct. 1327, 167 L. Ed. 2d 86 (2007), and cert. denied sub nom. *Garcia* v. *United States*, 549 U.S. 1212, 127 S. Ct. 1338, 167 L. Ed. 2d 86 (2007). We therefore conclude that the trial court did not abuse its discretion in denying the defendant's motions for a mistrial.

IV

Finally, we consider the defendant's evidentiary claim. The defendant contends that the trial court abused its discretion in admitting, as consciousness of guilt evidence, a detective's testimony pertaining to, and a video recording of, the defendant's refusal to cooperate with the police while they were taking a buccal swab sample from him. The defendant claims that these two pieces of evidence, namely, the testimony and the video recording, were inadmissible because

they were not probative of consciousness of guilt and because they were more prejudicial than probative. The state responds that the defendant's evidentiary claim with respect to both the detective's testimony and the video recording are unpreserved. Alternatively, the state argues that the trial court did not abuse its discretion in admitting the testimony and the video recording, and that, even if the court did abuse its discretion in admitting the evidence, their admission was harmless.

The following additional facts are relevant to our resolution of the defendant's claim. Approximately one year after Vazquez was killed and one year before the police arrested the defendant for that killing, the police obtained a warrant to take a buccal swab sample from the defendant. By that time, the police suspected that the defendant had shot and killed Vazquez, and they sought the buccal swab sample so that they could compare the defendant's DNA to that found on a hat and a pair of glasses recovered from the scene of the crime. Erica and Nairobi had both seen the defendant wearing a similar hat and glasses on the night of the shooting, before the shooting occurred. When Serano saw the defendant leaving the house party at which Vazquez was killed, however, he noticed that the defendant was *not* wearing glasses or a hat. Erica and another witness also had seen the defendant wear a similar hat on previous occasions.

The police approached the defendant to take the buccal swab sample while he was in custody for reasons unrelated to the shooting of Vazquez and presented him with one page of the warrant that they had obtained, but the defendant refused to cooperate. The police officers therefore took the buccal swab sample by force. The incident was captured on a video camera positioned outside of the cell in which the defendant was being held. Given the location from which the video recording was taken and the quality of that recording, however, the video recording depicted only the defendant's conversation with the police officers outside the cell before and after the swab sample was taken and did not show the officers actually taking the swab sample by force. Thereafter, the results of the DNA testing revealed that the defendant possibly contributed to the DNA on the hat.

At trial, the state called one of the detectives who was present when the police took the buccal swab sample from the defendant to testify about the incident as evidence of the defendant's consciousness of guilt. The state also sought to enter into evidence the video recording of the incident for the same purpose. Defense counsel initially objected to any references to the buccal swab incident but then limited his objection to the introduction of the video recording.[13] On that point, defense counsel stated: "I don't think I would have a problem with the testimony from . . . the officer that [the

defendant] refused to give [the buccal swab sample] and that they had to hold him down. But what I really find . . . so prejudicial is the fact that it's [recorded] and that [the jurors] get [to] watch this—this whole incident. . . . If [the detective] wants to testify that [the defendant] refused and that they had to, you know, force him to get it from him, you know, I . . . distinguish between those two. And the [distinction] to me is that the [recording] is so prejudicial." The trial court overruled the objection and admitted both the testimony and the video recording, noting that "[defense] counsel indicated that he did not truly object to the evidence concerning the refusal, but he was more concerned with the [video recording] itself being too prejudicial." The detective testified at trial about how the defendant had resisted when the police took the buccal swab sample, and the jury viewed the video recording of the incident.

### A

Before reaching the merits of the defendant's evidentiary claim, we first must consider whether the defendant preserved his claim for appellate review. The state contends that defense counsel not only affirmatively waived any objection to the detective's testimony but that, in doing so, defense counsel also waived any objection to the *video recording* because the testimony and video recording were substantively identical. The defendant argues that defense counsel never waived his objections to either piece of evidence and that the defendant preserved this claim on the basis of defense counsel's objection at trial and his motion for a judgment of acquittal or for a new trial. We agree with the state in part and conclude that the defense waived any objection to the detective's testimony but that defense counsel's objection to the video recording preserved for appeal the issue of the recording's admissibility.

It is well settled that we review claims alleging an improper evidentiary ruling only if they are distinctly raised at trial. See, e.g., *State* v. *Simpson*, 286 Conn. 634, 645, 945 A.2d 449 (2008). "When a party consents to or expresses satisfaction with an issue at trial, claims arising from that issue are deemed waived and may not be reviewed on appeal." *State* v. *Smith*, 289 Conn. 598, 621, 960 A.2d 993 (2008).

In the present case, we agree with the trial court that defense counsel did not object to the admission of the detective's testimony regarding the taking of the buccal swab sample. Defense counsel waived any objection to that testimony when he stated, "I don't think I would have a problem with the testimony" and then expressly distinguished the testimony from the video recording to which he objected. Thus, the defendant failed to preserve the issue of the admissibility of the detective's testimony.

We do not believe, however, that defense counsel also thereby waived his objection to the admission of the video recording of the buccal swab incident. Although it may not have been the most prudent decision to distinguish the detective's testimony from the video recording, given that they involved identical subject matter, we do not believe that defense counsel waived his objection to the admission of the video recording by waiving his objection to the detective's testimony. A party may object to only one of two pieces of evidence that are in substance the same, but differ in form, when the form of one is objectionable. This appears to be what defense counsel did in the present case. Initially, defense counsel objected to both the detective's testimony and the video recording on the ground that they were not probative of the defendant's consciousness of guilt. After waiving his objection to the detective's testimony, however, defense counsel then objected to the video recording on the additional basis that the video recording was unduly prejudicial. Thus, we conclude that the defendant preserved his claim that the trial court had abused its discretion in admitting the video recording of the buccal swab incident.

B

We now address the merits of the defendant's evidentiary claim. The defendant argues that the video recording was inadmissible because it was not probative of consciousness of guilt and because its prejudicial effect outweighed its probative value. We disagree and conclude that the trial court did not abuse its discretion in admitting the video recording into evidence.[14]

We review a trial court's evidentiary rulings for abuse of discretion. E.g., *State* v. *Coccomo*, 302 Conn. 664, 670–71, 31 A.3d 1012 (2011). "We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Internal quotation marks omitted.) Id., 671.

"In a criminal trial, it is relevant to show the conduct of an accused, as well as any statement made by him subsequent to the alleged criminal act, which may fairly be inferred to have been influenced by the criminal act. . . . Generally speaking, all that is required is that . . . evidence [of consciousness of guilt] have relevance, and the fact that ambiguities or explanations may exist which tend to rebut an inference of guilt does not render [such] evidence . . . inadmissible but simply constitutes a factor for the jury's consideration. . . . The fact that the evidence might support an innocent explanation as well as an inference of a consciousness of guilt

does not make [the admission of evidence of consciousness of guilt] erroneous. . . . Moreover, [t]he court [is] not required to enumerate all the possible innocent explanations offered by the defendant. . . . [I]t is the province of the jury to sort through any ambiguity in the evidence in order to determine whether [such evidence] warrants the inference that [the defendant] possessed a guilty conscience." (Citations omitted; internal quotation marks omitted.) Id., 669–70. Moreover, evidence of a defendant's consciousness of guilt is admissible only if its probative value outweighs its prejudicial effect. See, e.g., *State* v. *Hill*, 307 Conn. 689, 698, 59 A.3d 196 (2013).

Applying these principles to the present case, we conclude that the defendant's reaction to the detectives who took the buccal swab sample "may fairly be inferred to have been influenced by the criminal act" of shooting and killing Vazquez. (Internal quotation marks omitted.) *State* v. *Coccomo*, supra, 302 Conn. 669. Two witnesses saw the defendant wearing a hat before the murder, and one witness saw the defendant *not* wearing a hat after the murder. Moreover, the police later found a hat similar to the hat that Erica and Nairobi had seen the defendant wearing the night of the murder in the basement where Vazquez was killed. On the basis of these facts, the jury reasonably could have inferred that the defendant had refused to cooperate with the detectives because he believed that the buccal swab sample might produce DNA evidence linking him to the murder of Vazquez. The fact that there are alternative explanations for the defendant's refusal to cooperate with the police officers taking the buccal swab sample, or that additional facts would have made the defendant's conscious of guilt more obvious, is irrelevant. See id., 669–70.

We also conclude that the prejudicial effect of the video recording did not outweigh its probative value. The defendant does not specify what prejudicial effect the video recording had on the jury, beyond the fact that seeing the defendant in custody generally suggests that he was guilty of some other misconduct. The defendant cannot argue that the video recording was the type of inflammatory visual that would unduly arouse the jurors' emotions, particularly in view of the fact that the video recording did not show the defendant's physical struggle with the police officers. Whatever prejudicial effect the defendant's lack of cooperation may have had, it paled in comparison to the prejudicial nature of the murder charge the defendant was facing, one of the most heinous crimes of which one can be accused. Cf. *State* v. *Mooney*, 218 Conn. 85, 130–31, 588 A.2d 145 (evidence of defendant's past larcenies not unduly prejudicial, in part, because they were not grave crimes in comparison to robbery and felony murder charges that defendant was facing), cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991).

We also reject the defendant's contention that the trial court should have excluded the video recording because the defendant "was trying to protect his constitutional rights." The defendant relies on a number cases in which we have held that "consciousness of guilt evidence should not be admitted when doing so would chill an important legal right or undermine public policy." *State* v. *Coccomo*, supra, 302 Conn. 677; see also *State* v. *Jones*, 234 Conn. 324, 358–59, 662 A.2d 1199 (1995) (trial court improperly instructed jury that it may consider, as proof of consciousness of guilt, evidence that defendant refused to comply, on religious grounds, with court order directing him to give hair and blood samples). The defendant fails to appreciate, however, that he had no constitutional right to refuse to comply with the warrant for the buccal swab sample. See *Bumper* v. *North Carolina*, 391 U.S. 543, 550, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968); see also General Statutes § 54-33d (prohibiting person from, inter alia, resisting, impeding or interfering with any person authorized to execute search warrant or to effect search or seizure in performance of his official duties). Moreover, the defendant has not identified any independent legal right or public policy that would be infringed by deeming the video recording in question admissible evidence of the defendant's consciousness of guilt. Thus, we conclude that the trial court did not abuse its discretion in admitting the video recording of the defendant refusing to cooperate with the police officers who took the buccal swab sample.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] The defendant subsequently was convicted of interfering with a search in violation of General Statutes § 54-33d. See *State* v. *Gonzalez*, 144 Conn. App. 353, 355, 71 A.3d 681, cert. denied, 310 Conn. 914, 76 A.3d 630 (2013).

[2] The defendant also was charged with criminal possession of a firearm in violation of General Statutes (Rev. to 2007) § 53a-217 (a).

[3] To protect the privacy interests of the jurors, we refer to them by their first and last initials.

[4] The court commenced its investigation regarding the allegations against Q.A. on October 20, 2011, and excused Q.A. the following day. C.S. was absent on October 21, 2011, but had been present on October 20, 2011, when the court interviewed each juror regarding Q.A.'s alleged refusal to participate in deliberations.

[5] The state subsequently nolled the charge of criminal possession of a firearm. See footnote 2 of this opinion.

[6] "A Chip Smith instruction reminds the jurors that they must act unanimously, while also encouraging a deadlocked jury to reach unanimity." (Internal quotation marks omitted.) *State* v. *O'Neil*, 261 Conn. 49, 51 n.2, 801 A.2d 730 (2002).

[7] General Statutes § 54-82h (c) provides in relevant part: "If the alternate juror becomes a member of the regular panel after deliberations began, the jury shall be instructed by the court that deliberations by the jury shall begin anew. . . ."

[8] Another alternate juror was substituted for C.S. at this time. See part II of this opinion.

[9] Q.A.'s conduct is distinguishable from that of the excused juror in *People* v. *Allen*, 53 Cal. 4th 60, 264 P.3d 336, 133 Cal. Rptr. 3d 548 (2011), a case on which the defendant relies. In *Allen*, a witness testified at trial that he had seen one of the defendants commit murder, even though a time card from the witness' employer indicated that he was at work when the murder

occurred. Id., 64. The witness, who was Hispanic, explained that a coworker had clocked him into work that day, even though he was not actually at work. See id. In discussing this testimony, one juror stated: "That's a lie. I know Hispanics, they never cheat on timecards, so this witness . . . was at work [when the crime occurred], end of discussion." (Internal quotation marks omitted.) Id., 66. In light of the juror's comment, the trial court excused the juror for, inter alia, considering facts outside of the evidence. Id., 68.

The California Supreme Court held that the trial court improperly had excused the juror. Id., 78. The court reasoned that the juror had not engaged in misconduct but, rather, was permissibly applying his life experience to evaluate a witness' credibility. Id.

The present case is not analogous to *Allen*. In the present case, the trial court found that Q.A. had suggested that witnesses had been bribed. Thus, unlike the excused juror in *Allen*, Q.A. was suggesting that witnesses were not credible because she had *information pertaining specifically to the witnesses themselves*, not because her general knowledge and experience informed her that a witness' testimony was unreliable. Q.A.'s conduct is more akin to a juror who personally knows a witness or a party and who bases her verdict on her past experience with that person instead of the evidence presented at trial. Cf. *State* v. *Anderson*, 65 Conn. App. 672, 675–78, 783 A.2d 517 (2001) (trial court excused juror who stated he knew defendant from " 'the street' " and that defendant was " 'not a very nice person' "). Thus, we reject the defendant's contention that *Allen* supports overturning the trial court's decision to excuse Q.A. for considering matters extraneous to the evidence presented at trial.

[10] We reject the state's contention that the defendant failed to preserve this claim for appellate review. The defendant cited to, and attached copies of, the leading cases on this point in his motion for a mistrial and motion for a judgment of acquittal or for a new trial. Thus, the state cannot now claim to be taken by surprise by this claim on appeal.

[11] Some federal and state appellate courts have adopted a heightened standard that trial courts must apply before excusing a juror for refusing to deliberate in good faith. For instance, the Ninth Circuit has held that, "if the record evidence discloses any *reasonable* possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror. Under such circumstances, the trial judge has only two options: send the jury back to continue deliberating or declare a mistrial." (Emphasis in original; footnote omitted.) *United States* v. *Symington*, supra, 195 F.3d 1087. Other jurisdictions follow variants of that basic rule. See, e.g., *United States* v. *Abbell*, 271 F.3d 1286, 1302 (11th Cir. 2001) (juror cannot be excused unless it is established " 'beyond [a] reasonable doubt' " that he or she is not being excused for views on merits of case), cert. denied, 537 U.S. 813, 123 S. Ct. 74, 154 L. Ed. 2d 16 (2002); *United States* v. *Thomas*, supra, 116 F.3d 622–23 (juror may not be excused if there is " 'any possibility,' " instead of any reasonable possibility, that juror's view of merits of case serves as basis for request to excuse). But see *People* v. *Cleveland*, 25 Cal. 4th 466, 484, 21 P.3d 1225, 106 Cal. Rptr. 2d 313 (2001) (rejecting heightened standard and ruling that dismissal is permissible if there is "a 'demonstrable reality' that the juror is unable or unwilling to deliberate").

The courts that have adopted a heightened standard have done so in recognition of "the difficulty in detecting the difference between a juror's illegal act of nullification, by deciding to vote against the weight of the evidence, and the juror's failure to be convinced of the defendant's guilt." *United States* v. *Baker*, 262 F.3d 124, 131 (2d Cir. 2001). Applying a heightened standard when a juror has been accused of refusing to deliberate in good faith "protects not only against the wrongful removal of jurors; it also serves to protect against overly intrusive judicial inquiries into the substance of the jury's deliberations." *United States* v. *Thomas*, supra, 116 F.3d 622. Specifically, requiring trial courts to engage in this type of an inquiry is intended to prevent a court from mistakenly excusing a juror for having doubts about the sufficiency of the evidence against a defendant, which violates a defendant's sixth amendment right to a unanimous jury. See *United States* v. *Brown*, supra, 823 F.2d 596. Applying a heightened standard is also intended to prevent the appearance that a trial court is "reconstituting a jury in order to reach a particular result," in violation of the defendant's right to an impartial jury under the sixth amendment. *State* v. *Elmore*, 155 Wn. 2d 758, 772, 123 P.3d 72 (2005); see id. ("[i]f a holdout juror is dismissed in a way that implies his dismissal stems from his views on the merits of the case, then the reconstituted jury may be left with impression that the

trial judge prefers a guilty verdict").

The jurisdictions that have adopted a heightened standard, however, have expressly limited it to cases in which "the allegations [of juror misconduct] go to the quality and coherence of the juror's views on the merits . . . ." *United States* v. *Symington*, supra, 195 F.3d 1087 n.6. That is, the heighten standard applies "only to those dismissals where the juror's conduct cannot be evaluated without delving into the reasons underlying the jurors' views of the case, i.e., where the deliberative process has been implicated." *United States* v. *Edwards*, 303 F.3d 606, 633 (5th Cir. 2002).

Accordingly, courts do not apply a heightened standard when a juror is accused of engaging in misconduct that does not relate to the substance of jury deliberations. Specifically, they do not apply the heightened standard when a juror is alleged to have considered extrinsic evidence during deliberations. See id., 632–33; see also *United States* v. *Ebron*, supra, 683 F.3d 127–28. Courts do not apply the heightened standard in such instances because "accusations that a deliberating juror has discussed or considered extrinsic evidence . . . can be investigated without direct discussion of the juror's views about the merits of the case." (Citations omitted.) *State* v. *Elmore*, supra, 155 Wn. 2d 770.

[12] After the jury found the defendant guilty, the defendant also filed a motion for a judgment of acquittal or for a new trial on the ground that the trial court improperly had replaced Q.A. and C.S. with alternate jurors instead of declaring a mistrial. The trial court denied this motion, as well.

[13] In addition to objecting to the admission of the video recording at trial, the defense also filed a motion in limine prior to trial seeking to exclude from evidence the video recording of the buccal swab incident.

[14] The defendant claims that, even if he failed to preserve the issue of the admissibility of the detective's testimony, we nevertheless should resolve that issue in the defendant's favor under the plain error doctrine if we decide that it was improper to admit the video recording. Because we conclude that the trial court did not abuse its discretion in admitting the video recording, we reject the defendant's claim under the plain error doctrine. See, e.g., *State* v. *Darryl W.*, 303 Conn. 353, 373, 33 A.3d 239 (2012) (reversal under plain error doctrine first requires determination that trial court committed error).