******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ELIAS V.*
(AC 38487)

Alvord, Keller and Pellegrino, Js.

*Argued May 11—officially released September 20, 2016*

(Appeal from Superior Court, judicial district of
Hartford, Suarez, J.)

*Katherine C. Essington*, assigned counsel, for the
appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with
whom, on the brief, were *Gail P. Hardy*, state's attor-
ney, and *Chris A. Pelosi*, senior assistant state's attor-
ney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Elias V., appeals from the judgment of conviction, rendered after a jury trial, of three counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1); one count of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1); one count of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (A); two counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (1); and three counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2). On appeal, the defendant claims that (1) the court improperly excused a juror before trial without first notifying the defendant or his counsel; (2) the court committed plain error concerning the constancy of accusation testimony at trial; and (3) the prosecutor engaged in impropriety in his cross-examination of the defendant and in closing argument. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. In 2003, the defendant began to sexually abuse his older daughter E.V., who was nine years old at the time. Over the next eight years, the defendant frequently subjected E.V. to various forms of sexual abuse, including forced vaginal penetration, attempted anal penetration, oral sex, masturbation, and other sexual contact with her intimate parts.[1]

In addition to sexually abusing E.V., there was extensive testimony about the defendant regularly exposing E.V. and his younger daughter, K.V., to other forms of abuse that jeopardized their health and welfare. For example, the defendant was very possessive of E.V. and K.V., and he would inspect K.V. in the shower to ensure that she was a virgin, check E.V.'s body after school for hickeys, and dress both of the girls in boys clothing. He would also force E.V. and K.V. to consume alcohol. Finally, the defendant was prone to violent outbursts, and he would regularly physically abuse K.V. and occasionally physically abuse E.V. The defendant's violent, controlling, and, at times, paranoid behavior was often exacerbated by his use of crack cocaine.

The events that led to the defendant's arrest were set in motion by two reports, made by E.V.'s and K.V.'s schools, to the Department of Children and Families (department) in 2011. While E.V. was enrolled in high school, the defendant would frequently require E.V. to stay home under the pretense of having her take care of the house so that he could sexually abuse her. In the fall of 2010, E.V. confided in a teacher, with whom she had taken classes throughout her four years of high school, that she often missed school because her father insisted that she stay home "to take care of him, the house, and her little brother,"[2] not because she was

ill, as she had previously indicated. The teacher then notified the principal, school social worker and the school resource officer about the potential truancy issue. Over the next few months, the school resource officer spoke to E.V.'s parents about her absenteeism in an attempt to resolve the issue. When E.V.'s absenteeism persisted, the school resource officer contacted the department on March 3, 2011.

That same day, K.V. arrived home late from school because the public bus she took home had broken down. When she arrived home, the defendant extensively beat her, leaving bruises on her face and body, because she was late and he did not believe her excuse. On March 4, 2011, despite the visible bruising, K.V. went to school.[3] At the urging of friends, K.V. went to the school counselor, who called the department. The department sent an investigator, Gloria Rodriguez, to interview K.V. about the potential physical abuse. Rodriguez was also provided with the report E.V.'s school had made about her absenteeism and potential educational neglect. After interviewing K.V. and her mother, M.V., Rodriguez suspected that E.V. was being sexually abused at home. When Rodriguez interviewed E.V., she directly asked her whether she was being sexually abused, and E.V. confirmed that she was being sexually abused by her father.

On February 3, 2014, a trial commenced on a ten count long form information, charging the defendant in eight counts for his sexual abuse of E.V. and in two counts for his sexual and nonsexual abuse of E.V. On February 10, 2014, the jury returned a guilty verdict on all counts. This appeal followed.

I

The defendant first claims on appeal that the court improperly excused a regular juror before trial without first notifying the defendant or his counsel. Because the defendant failed to preserve this claim for appeal, he seeks *Golding* review,[4] arguing that the court violated his state and federal constitutional rights by excusing a juror without first notifying the defendant or his counsel. Alternatively, the defendant seeks reversal under the plain error doctrine, arguing that the trial court failed to "articulate sufficient facts to support the conclusion that the juror was no longer able to perform her duties due to her diagnosis," as required by General Statutes § 54-82h (c). The state responds that both claims are unreviewable under *Golding* and do not warrant reversal under the plain error doctrine because the substitution of a regular juror for an alternate juror does not implicate a defendant's constitutional rights and the court complied with § 54-82h (c) when it dismissed the juror for good cause. We agree with the state.

A

We first address the defendant's claim that the court

violated his state and federal constitutional rights when it excused the juror without first notifying the defendant or his counsel.[5] The defendant argues that he was entitled to notice prior to the excusal of the juror on the basis of the right to individual voir dire under article first, § 19, of the Connecticut constitution, as amended by article four of the amendments; the right to counsel under the sixth and fourteenth amendments to the United States constitution; and the due process right to be present at all critical stages of a prosecution under the fifth and fourteenth amendments to the United States constitution.[6]

The defendant seeks *Golding* review. "Under *Golding*, a defendant can prevail on a claim of constitutional error not preserved at trial only if the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Internal quotation marks omitted.) *State* v. *Dixon*, 318 Conn. 495, 511, 122 A.3d 542 (2015).

We conclude that the defendant's constitutional claims are unreviewable because he has failed to allege claims of constitutional magnitude as required by the second prong of *Golding*.

1

The defendant argues that article first, § 19, of the Connecticut constitution, requires a court to notify a defendant when a selected juror indicates that she is no longer able to participate in the proceeding so that defense counsel has an opportunity, if necessary, to voir dire the juror.[7] We disagree.

Article first, § 19, provides in pertinent part that "[t]he right to question each juror individually by counsel shall be inviolate." Article first, § 19, does not, however, vest parties with an absolute right to question prospective and selected jurors individually at any time. Instead, our Supreme Court has interpreted article first, § 19, as constitutionalizing only "certain rights . . . regarding the *selection* of individual jurors," namely, the right "to challenge jurors peremptorily" and the "right of the parties to have counsel conduct individual examinations of *prospective* jurors . . . ." (Emphasis added; internal quotation marks omitted.) *Rozbicki* v. *Huybrechts*, 218 Conn. 386, 391–93, 589 A.2d 363 (1991); see also *State* v. *Griffin*, 251 Conn. 671, 699, 741 A.2d

913 (1999) ("[t]he purpose of voir dire is to facilitate [the] intelligent exercise of peremptory challenges and to help uncover factors that would dictate disqualification for cause" [internal quotation marks omitted]).

Here, the defendant challenges the court's decision to excuse a *selected* juror without first notifying him or counsel. Therefore, article first, § 19, is inapposite, and this claim does not merit *Golding* review.

2

The defendant also invokes his right to counsel under the sixth and fourteenth amendments to the United States constitution and his due process right to be present under the fifth and fourteenth amendments to the United States constitution to support his claim that he was entitled to notice prior to the juror's excusal. Because of the interrelated nature of these claims, we address them together.

"[T]he right to personal presence at all critical stages of the trial and the right to counsel are fundamental rights of each criminal defendant." (Internal quotation marks omitted.) *State* v. *Bonner*, 290 Conn. 468, 491, 964 A.2d 73 (2009). Whether a particular matter constitutes a critical stage depends not on the timing but on the nature of the matter.

"The cases have defined critical stages [for the right to counsel] as proceedings between an individual and agents of the State (whether 'formal or informal, in court or out,' . . .) that amount to 'trial-like confrontations,' at which counsel would help the accused 'in coping with legal problems or . . . meeting his adversary' "; (citation omitted) *Rothgery* v. *Gillespie County*, 554 U.S. 191, 212 n.16, 128 S. Ct. 2578, 171 L. Ed. 2d 366 (2008); as well as proceedings in which "counsel's absence might derogate from the accused's right to a fair trial"; *United States* v. *Wade*, 388 U.S. 218, 226, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967). In the context of the right to be present, "courts have evaluated the extent to which a fair and just hearing would be thwarted by [the defendant's] absence or whether his presence has a relation, reasonably substantial, to the [fullness] of his opportunity to defend against the charge" when determining whether a proceeding is a critical stage. (Internal quotation marks omitted.) *State* v. *Gilberto L.*, 292 Conn. 226, 237, 972 A.2d 205 (2009).

In this case, the court's decision to excuse the juror because of a medical diagnosis did not amount to a "trial-like" confrontation between the state and the defendant. Nor did it implicate the defendant's right to a fair trial; "the mechanisms for providing for and dismissing alternate jurors, and the circumstances under which they may be substituted for regular jurors, do not implicate [state or federal] constitutional rights." *State* v. *Williams*, 231 Conn. 235, 244, 645 A.2d 999 (1994), overruled in part on other grounds by *State* v.

*Murray*, 254 Conn. 472, 487, 757 A.2d 578 (2000) (en banc);[8] see also *State* v. *LaBrec*, 270 Conn. 548, 559, 854 A.2d 1 (2004). Finally, the discretionary decision to excuse the juror in this circumstance was a straightforward judicial administrative action not implicating the defendant's ability to defend himself later at trial.[9]

We conclude that the defendant's claims are unreviewable because the excusal of the juror in this case does not implicate the defendant's constitutional rights as required by the second prong of *Golding*.

B

The defendant also seeks reversal under the plain error doctrine, arguing that the court violated § 54-82h (c) by making insufficient factual findings of good cause before excusing the juror.[10] The state responds that consideration of the defendant's claim under the plain error doctrine is inappropriate in this case because the decision to excuse a juror is committed to the sound discretion of the court, and the court in this case was within its discretion to grant the juror's request to be excused due to a medical condition. We agree with the state.

The plain error doctrine permits the court to "reverse or modify the decision of the trial court if it determines . . . that the decision is . . . erroneous in law. . . ." Practice Book § 60-5. It "is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy." *State* v. *Cobb*, 251 Conn. 285, 343 n.34, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000). "A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Internal quotation marks omitted.) *State* v. *LaBrec*, supra, 270 Conn. 559.

In the present case, we perceive no impropriety that would result in manifest injustice. "Under settled principles, [a] court may excuse a regular juror if that juror, for any reason, becomes unable to perform his or her duty. General Statutes § 54-82h (c). The power to excuse a juror under this section is expressly premised on a finding of cause. . . . Whether in the circumstances just cause exists to excuse a juror is a matter within the discretion of the . . . court." (Internal quotation marks omitted.) *State* v. *Apodaca*, 303 Conn. 378, 386, 33 A.3d 224 (2012).

"We have recognized that unavailability due to illness may constitute cause to excuse a juror," even if the medical condition will render the juror available for a short or indeterminable period. *State* v. *Gonzalez*, 315 Conn. 564, 583, 585, 109 A.3d 453 (2015); see, e.g., *State*

v. *Apodaca*, supra, 303 Conn. 386–87 (trial court's decision to excuse juror that was ill overnight with flu and unable to confirm when she would return was not abuse of discretion). Here, the trial court articulated a proper basis for its decision to excuse the juror: the juror was diagnosed with a medical condition that prevented the juror from taking part in the trial.

The defendant nevertheless insists that the trial court was obligated to "state the diagnosis or medical condition of the juror on the record, describe her current physical condition, or detail what medical treatment or intervention was necessary." Neither the plain language of § 54-82h (c) nor our case law interpreting it[11] mandate an invasion of the juror's privacy interests in this manner.

From our careful review of the record, we conclude that the defendant has not met this stringent standard for reversal under the plain error doctrine concerning his unpreserved claim.

II

We next address the defendant's claims that the court (1) sua sponte should have stricken testimony that exceeded the scope of the constancy of accusation doctrine, and (2) erroneously instructed the jury concerning the proper usage of constancy of accusation testimony.[12] Because the defendant failed to preserve these issues at trial, he now claims that they warrant reversal under the plain error doctrine. We conclude that both claims are unreviewable.

In sex crime cases, a person to whom a sexual assault victim has reported the assault may testify about the report, but this testimony is subject to certain restrictions. *State* v. *Troupe*, 237 Conn. 284, 290–91 n.7, 677 A.2d 917 (1996) (en banc); Conn. Code Evid. § 6-11 (c). First, the witness may testify only "with respect to the fact and timing of the victim's complaint" and the details regarding "the assault must be strictly limited to those necessary to associate the victim's complaint with the pending charge, including, for example, the time and place of the attack or the identity of the alleged perpetrator." *State* v. *Troupe*, supra, 304. Second, "such evidence is admissible only to corroborate the victim's testimony and not for substantive purposes." Id. With this legal framework in mind, we address each of the defendant's claims in turn.

A

The defendant first claims that the court sua sponte should have stricken the testimony by M.V. and Rodriguez about the types of sexual acts the defendant engaged in with E.V. because it went beyond the fact and timing of E.V.'s complaint.[13] The state responds that this claim cannot be reviewed because defense counsel never objected to this testimony, and the court was under no obligation to strike the evidence sua sponte.

We agree with the state.

It is well settled that "when opposing counsel does not object to evidence, it is inappropriate for the trial court to assume the role of advocate and decide that the evidence should be stricken. . . . The court cannot determine if counsel has elected not to object to the evidence for strategy reasons. . . . Experienced litigators utilize the trial technique of not objecting to inadmissible evidence to avoid highlighting it in the minds of the jury. Such court involvement might interfere with defense counsel's tactical decision to avoid highlighting the testimony. When subsequent events reveal that it was an imprudent choice, however, the defendant is not entitled to turn the clock back and have [the appellate court] reverse the judgment because the trial court did not, sua sponte, strike the testimony and give the jury a cautionary instruction." (Citations omitted.) *State* v. *Wragg*, 61 Conn. App. 394, 399, 764 A.2d 216 (2001) (no plain error for the court to refrain from striking, sua sponte, the constancy of accusation testimony).

We therefore conclude that it was not plain error for the court to refrain from sua sponte striking the constancy of accusation testimony of M.V. and Rodriguez.

B

The defendant next claims that the court's instruction on the constancy of accusation testimony was defective in two respects: (1) the court erroneously omitted M.V.'s name from the instruction and (2) the instruction was misleading concerning the permissible use of the constancy of accusation testimony. We disagree.

On February 6, 2014, the court conducted a charging conference in chambers at which it provided a copy of the draft jury instructions to both counsel and received their comments. On February 7, 2014, the court memorialized this conference on the record, discussing the changes that counsel requested. In pertinent part, defense counsel had requested a delay reporting instruction under the constancy of accusation instruction, and the court granted that request.[14] Notably, the constancy of accusation charge referenced only Rodriguez' testimony about E.V.'s report of sexual abuse to her, not M.V.'s testimony about E.V.'s report of sexual abuse to her. The defendant did not request that M.V.'s name be included in the charge nor did he object to the omission.

As the defendant concedes, because defense counsel participated in a charging conference, did not submit a written request to charge the jury concerning M.V.'s testimony, and expressed satisfaction with the instruction, which referenced only the testimony of Rodriguez, he waived any challenge to the jury instruction at trial under *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011); see also *State* v. *Coleman*, 304 Conn. 161,

174–75, 37 A.3d 713 (2012) (recognizing that a defendant can expressly and implicitly waive a claim of instructional error). Consequently, the defendant asserts that both instructional error claims warrant consideration under the plain error doctrine.

As an initial matter, "[t]his court has adhered to the view that waiver thwarts a finding that plain error exists." *State* v. *Bialowas*, 160 Conn. App. 417, 430, 125 A.3d 642 (2015) (collecting cases). However, even if we were to assume, without deciding, that the defendant's waiver would not preclude him from seeking such relief; see *State* v. *Darryl W.*, 303 Conn. 353, 371–72 n.17, 33 A.3d 239 (2012) ("[w]e recognize that there appears to be some tension in our appellate case law as to whether reversal on the basis of plain error could be available in cases where the alleged error is causally connected to the defendant's own behavior"); we conclude that the defendant cannot demonstrate that the claimed impropriety was so clear, obvious and indisputable as to warrant the extraordinary remedy of reversal.

The defendant first argues that the court erred by not including M.V.'s name in the jury instruction. To prevail, the defendant would have to demonstrate that a failure in an evidentiary instruction to refer to all of the evidence that the instruction could possibly encompass is plain error. There is, however, no such general rule. Nor is there such a rule in the constancy of accusation context in particular. See *State* v. *Troupe*, supra, 237 Conn. 305 (stating only that "the defendant is entitled to an instruction that any delay by the victim in reporting the incident is a matter for the jury to consider in evaluating the weight of the victim's testimony"); Conn. Code Evid. § 6-11 (c) (not requiring limiting instruction where there has been no request).

"It is well established in Connecticut . . . that the trial court generally is not obligated, sua sponte, to give a limiting instruction." *State* v. *Cator*, 256 Conn. 785, 801, 781 A.2d 285 (2001); see also *State* v. *Hill*, 307 Conn. 689, 705 n.12, 59 A.3d 196 (2013). "The failure by the trial court to give, sua sponte, an instruction that the defendant did not request, that is not of constitutional dimension and that is not mandated by statute or rule of practice is not such an obvious error that it will affect the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Eason*, 47 Conn. App. 117, 120, 703 A.2d 130 (1997), cert. denied, 243 Conn. 962, 705 A.2d 552 (1998). We conclude therefore that the defendant's first claim of instructional error fails to meet the stringent requirements of plain error review.

Next, the defendant argues that the jury instruction undoubtedly left the jury with the impression that Rodriguez' testimony about E.V.'s out-of-court report of sexual abuse could be used as substantive evidence of that abuse or to corroborate all of E.V.'s in-court testimony

concerning all of the offenses, not just to corroborate the fact that E.V. reported the defendant's sexual abuse to Rodriguez. We disagree.

"The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error." (Internal quotation marks omitted.) *State* v. *Apodaca*, supra, 303 Conn. 390–91.

In this case, the court's instruction, when read in its entirety, adequately conveyed to the jury the limited permissible usage of the constancy of accusation testimony. The court began its charge by explaining the difference between E.V.'s in-court testimony about her abuse, which "[y]ou may use . . . as evidence and proof of the facts asserted," and Rodriguez' testimony about E.V.'s out-of-court report of abuse, the usage of which "was limited in scope to *the fact and timing of the complainant's complaint, the time and place of the alleged sexual assault*, and the *identity of the alleged perpetrator*." (Emphasis added.)

The court went on to instruct the jury that the constancy of accusation testimony "is to be considered by you only in determining the weight and credibility" of E.V.'s testimony, not "to prove the truth of the matter asserted in the out-of-court statement." Finally, toward the close of its charge, the court again instructed the jury concerning the limited permissible usage of this evidence. The court explained that if the jury found that E.V.'s in-court and out-of-court statements about her abuse were consistent, the jury "may find her testimony in the court to be corroborated or supported with respect to *the fact and timing of her complaint, the time and place of the alleged sexual assault, and the identity of the alleged perpetrator*." (Emphasis added.)

Notably, the court's description of the permissible uses of the constancy of accusation testimony at the beginning and end of its charge was virtually identical to the Supreme Court's description of the permissible uses of constancy of accusation testimony in *Troupe*. See *State* v. *Troupe*, supra, 237 Conn. 304 (stating that a witness "may testify only with respect to *the fact and timing of the victim's complaint*" and that the details of the assault "must be strictly limited to those necessary to associate the victim's complaint with the pending charge, including, for example, *the time and place of the attack* or *the identity of the alleged perpetrator*" [emphasis added]); see also Conn. Code Evid. § 6-11 (c) ("A person to whom a sexual assault victim has reported the alleged assault may testify that the allegation was made and when it was made . . . . Any testimony by the witness about details of the assault shall

be limited to those details necessary to associate the victim's allegations with the pending charge.").

Likewise, the court's instruction as a whole is virtually identical to the instruction provided on the Judicial Branch's website for constancy of accusation testimony. See Connecticut Criminal Jury Instructions (4th Ed. 2008) § 7.2-1 (Rev. to May 20, 2011), available at http://www.jud.ct.gov/ji/criminal/part7/7.2-1.htm (last visited September 9, 2016). While this fact is not determinative of the matter before this court, as the Judicial Branch website instructions are nonbinding, it is instructive; particularly, when the instruction comports with the explanation of the doctrine set forth in our case law, as the instruction in this case did. See *State* v. *Coleman*, supra, 304 Conn. 176 (finding no plain error where "the instruction at issue is provided on the judicial branch's website" and accords with relevant case law).

Upon reviewing the constancy of accusation instruction given by the court in its entirety, therefore, a showing of plain error has not been made.

### III

Finally, we turn to the defendant's claims of prosecutorial impropriety. Specifically, the defendant claims that he was denied a fair trial because the prosecutor (1) injected extraneous matters into the trial and (2) improperly appealed to the passions and emotions of the jury. We conclude that there was no impropriety.

We review claims of prosecutorial impropriety under a two step analytical process. "The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry." (Citations omitted.) *State* v. *Fauci*, 282 Conn. 23, 32, 917 A.2d 978 (2007). "The defendant bears the burden of satisfying both of these analytical steps." *State* v. *O'Brien-Veader*, 318 Conn. 514, 524, 122 A.3d 555 (2015).

### A

The defendant first claims that the prosecutor injected extraneous matters into the trial by suggesting during his cross-examination of the defendant that the defendant was lying to avoid being labeled in prison as a sex offender. The state responds that the defendant's claim is evidentiary in nature and therefore is not preserved. We agree with the state.

At trial, the defendant elected to testify on his own behalf. During his cross-examination of the defendant,

the prosecutor, without objection, suggested that the defendant had a motive to lie to avoid being labeled in prison as a sex offender that sexually assaulted his daughter.[15]

"Although our Supreme Court has held that unpreserved claims of prosecutorial impropriety are to be reviewed under the [factors enunciated in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)], that rule does not pertain to mere evidentiary claims masquerading as constitutional violations." (Internal quotation marks omitted.) *State* v. *Alex B.*, 150 Conn. App. 584, 589, 90 A.3d 1078, cert. denied, 312 Conn. 924, 94 A.3d 1202 (2014); see also *State* v. *Rowe*, 279 Conn. 139, 151–52, 900 A.2d 1276 (2006) (declining to review a claim of prosecutorial impropriety that was evidentiary in nature). The defendant has failed to bring to our attention any law suggesting that it is constitutionally improper for a prosecutor to cross-examine a criminal defendant about his motive to lie, just as he would any other witness.

It is well settled that "[a]n accused in taking the stand subjects himself to the same rules and is called on to submit to the same tests which could by law be applied to other witnesses." *State* v. *Palozie*, 165 Conn. 288, 298, 334 A.2d 468 (1973) (holding that the state was permitted to question the defendant concerning his use of a "strap" on his children during a time period not within the information because it was relevant on the issue of the credibility of the defendant). This includes an examination of the defendant's motive to lie. *State* v. *Leconte*, 320 Conn. 500, 510, 131 A.3d 1132 (2016) ("[a]s an appropriate and potentially vital function of cross-examination, exposure of a witness' motive, interest, bias or prejudice may not be unduly restricted" [internal quotation marks omitted]); *State* v. *Warholic*, 278 Conn. 354, 381, 897 A.2d 569 (2006) ("[q]uestions about a witness' motive are proper because they seek to elicit facts from which a jury can make credibility determinations"); *State* v. *Holliday*, 85 Conn. App. 242, 261, 856 A.2d 1041 ("[o]ur jurisprudence instructs that a prosecutor may comment on a witness' motivation to be truthful or to lie"), cert. denied, 271 Conn. 945, 861 A.2d 1178 (2004).

The defendant has not cited any authority for the proposition that a prosecutor cannot question a defendant about his motive to lie because it relates to the collateral consequences of conviction in the case. Here, the defendant was charged in eight counts with offenses relating to his sexual abuse of E.V. If convicted of even one of these multiple counts, the defendant would not only be a "sex offender," but a sex offender that sexually abused his daughter. Exploring the defendant's motive to lie to avoid the well-known[16] stigmatizing effects of this classification did not inject an extraneous matter into the trial.

"[R]obing garden variety claims [of an evidentiary nature] in the majestic garb of constitutional claims does not make such claims constitutional in nature. . . . Putting a constitutional tag on a nonconstitutional claim will no more change its essential character than calling a bull a cow will change its gender." (Internal quotation marks omitted.) *State* v. *Ruffin*, 144 Conn. App. 387, 399, 71 A.3d 695 (2013), aff'd, 316 Conn. 20, 110 A.3d 1225 (2015). Here, the challenge to the cross-examination of the defendant by the prosecutor is evidentiary in nature and is unpreserved. Accordingly, it is not reviewable under *Williams*.

B

The defendant next alleges three acts of impropriety concerning the prosecutor's closing argument. First, the defendant claims that the prosecutor improperly suggested that "defendants in child sexual assault cases have an increased motive to lie for fear of being 'labeled' as a sex offender in jail." Second, the defendant argues that the prosecutor's remarks improperly appealed to the emotions and prejudices of the jurors by repeatedly calling the defendant a "sex offender." Finally, the defendant argues that the prosecutor improperly appealed to the emotions and prejudices of the jurors by encouraging them to find the defendant guilty because he was a "bad person" rather than on the basis of the evidence. We conclude that the prosecutor's remarks were not improper.

The following additional facts are necessary to our resolution of these claims. During his closing argument, the prosecutor explained to the jurors that the case required them to assess the credibility of all of the witnesses, and he reviewed the evidence that corroborated various witnesses' testimony. Toward the end of his closing argument, the prosecutor made the following remarks:

"But basically, for the sex assault, it comes down to E.V. and this defendant; so, you're going to have to compare their testimonies. Who is more credible? Okay?

"E.V.: Obedient. Never lied. Honor student. We saw the way she testified. God-fearing, as he said, as he put a knife—as she put a knife to her father where she almost had enough where she put a knife to his—his throat and said God won't forgive me if I did it. You have E.V. and that person.

"Person to person, who's always promised to change for years and years and years and never did. Similar to how he told E.V. after every time he penetrated her, I would stop. So, you have that person. You also have the person who would take the moneys—family's [social security disability] money for her son—for his son,[17] take the mom's employment money, take rent money, and spend it all on drugs.

"Also, [you] have a person impairing them, a person who continually beat [K.V.] for years—approximately seven years with his fists, his hands, his boots; hit her about the face, arms, legs, ribs, and stomach. More or less a person who never had a job. More or less a person who, for some reason—and I submit to you the reason was to be alone with her so she could sexually assault her—so he could sexually assault her—would keep her home from school; a person who lied to housing; who left [M.V.] with a $7000 bill; and also, a person who will be labeled a sex offender. So, with that said, ladies and gentlemen, I ask you: Who has the motive there to tell the truth?"

Defense counsel then addressed the jury and stated that the evidence "should actually probably not be reviewed" as it related to the defendant's testimony concerning the risk of injury to a child offenses charged in counts nine and ten of the information. He argued that while the defendant admitted to using crack, taking his family's money, and "making his family's life hell," he was not admitting to sexually assaulting E.V. He urged the jury to focus on the credibility of the state's witnesses as it related to the sexual abuse offenses charged in counts one through eight of the information. In particular, he argued that E.V. had a motive to lie about being sexually abused by the defendant to protect herself and her sister from the defendant's physical abuse.[18]

The prosecutor then began his rebuttal as follows: "Motivation, I mean, no father wants to admit he sexually assaulted his daughter between the ages of nine and sixteen. Let's face it, ladies and gentlemen, that's the motivation. You don't want to be labeled as a sex offender, okay?"

As the alleged impropriety occurred during closing argument, we set forth the applicable legal principles. "[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . [B]ecause closing arguments often have a rough and tumble quality about them, some leeway must be afforded to the advocates in offering arguments to the jury in final argument. [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Nevertheless, [w]hile a prosecutor may argue the state's case forcefully, such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Citation omitted; internal quotation marks omitted.) *State* v. *Necaise*, 97 Conn. App. 214, 229–30, 904 A.2d 245, cert. denied, 280 Conn. 942, 912 A.2d 478 (2006).

1

We first examine whether the prosecutor improperly argued that the defendant had a motive to lie to avoid being labeled a sex offender. Again, "[i]t is not improper for a prosecutor to remark on the motives that a witness may have to lie." *State* v. *Thompson*, 266 Conn. 440, 466, 832 A.2d 626 (2003); see also *State* v. *Ancona*, 270 Conn. 568, 607, 854 A.2d 718 (2004) ("[i]t is permissible for a prosecutor to explain [in closing argument] that a witness either has or does not have a motive to lie"), cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005). Nor is it improper for a prosecutor to suggest that the defendant, in particular, has a motive to lie so long as that motive is based on the "ascertainable motives of the witnesses" rather than the prosecutor's personal opinion. *State* v. *Stevenson*, 269 Conn. 563, 585, 849 A.2d 626 (2004); see also *State* v. *Fauci*, supra, 282 Conn. 39–40 ("in a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and thus to argue, that one of the two sides is lying," particularly where the argument only "underscored an inference that the jury could have drawn entirely on its own, based on the evidence presented" [internal quotation marks omitted]).

In this case, the prosecutor's remark that the defendant had a motive to lie to avoid being labeled a sex offender simply underscored an inference that the jury could have readily drawn on its own in light of the charges and the evidence presented at trial. Accordingly, the remark was not improper.

2

Next, we examine whether the prosecutor improperly appealed to the emotions and passions of the jury "by attaching the inflammatory label of child sex offender to him" and by attempting to persuade the jury to find the defendant guilty because he was a "bad person," rather than on the evidence presented. We conclude that the prosecutor did not improperly appeal to the emotions and passions of the jury.

"We begin with the well established proposition that [a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Internal quotation marks omitted.) *State* v. *Ceballos*, 266 Conn. 364, 394, 832 A.2d 14 (2003).

"We have held, however, that [i]t is not improper for the prosecutor to comment [on] the evidence presented at trial and to argue the inferences that the jurors might draw therefrom. . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper

unsworn testimony, with the suggestion of secret knowledge, on the other hand." (Internal quotation marks omitted.) *State* v. *Fauci*, supra, 282 Conn. 36. Similarly, "[t]he state's attorney should not be put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that he [or she] is simply saying I submit to you that this is what the evidence shows, or the like." (Internal quotation marks omitted.) *State* v. *Stevenson*, supra, 269 Conn. 583–84.

Turning first to the prosecutor's use of the phrase "sex offender," we conclude that this remark was not improper. Contrary to what the defendant suggests, the prosecutor did not label the defendant as a "sex offender" during his remarks; instead, he argued that the defendant had a motive to lie to avoid being labeled a sex offender upon conviction, and that remark was a permissible commentary. See *State* v. *Stevenson*, supra, 269 Conn. 585 n.15 (remark that "[t]he defendant has everything to gain if he lies on the stand. After all, it is he [who will] be punished in this case if he is found guilty" was permissible commentary on the defendant's motive to lie).

Next, the defendant argues that by reviewing the evidence that he took the family's money for drugs, physically abused K.V., had an insubstantial employment history and lied to housing authorities, the prosecutor encouraged the jury to find the defendant guilty of the sex offenses because he was a bad person, rather than on the evidence presented. The state responds that the prosecutor was not attempting to inflame the passions of the jury, but rather the prosecutor was permissibly recalling the undisputed evidence presented at trial about the defendant's character to assist the jurors' assessment of the defendant's credibility. We agree with the state.

Again, the critical issue relative to the claimed impropriety is whether the disputed remarks encouraged the jury to find the defendant guilty on the basis of emotion, rather than on a rational appraisal of the trial evidence, not simply whether the remarks might have painted a negative portrait of the defendant's character. Here, the prosecutor never suggested to the jury that because the evidence showed that the defendant was a bad person, he must have sexually assaulted his daughter. Instead, and just prior to the disputed remarks, the prosecutor acknowledged that the sexual assault charges boiled down to a credibility assessment of E.V. and the defendant. The prosecutor then proceeded to review, in a straightforward manner, the undisputed evidence presented at trial concerning both E.V.'s and the defendant's character. See *State* v. *Camacho*, 282 Conn. 328, 377, 924 A.2d 99 (2007) ("[a]s a general matter a prosecutor may use any evidence properly admitted at trial"), cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007).

Notably, the disputed remarks were based not only on the testimony of the state's witnesses, but also the defendant's own admissions at trial. During his testimony, the defendant admitted that he would take his wife's income and his son's disability benefits to purchase not only cocaine but also to purchase pornography and alcohol for himself.[19] The defendant acknowledged that during the time in question he worked only part-time and was eventually fired due to his poor performance. The defendant admitted that he lied on multiple occasions to the housing authority about the family's income to secure rent at a reduced rate under Section 8, and he testified that, on one occasion, when M.V. disclosed to the housing authority their actual income, the family was charged approximately $7000 for unpaid rent.[20] Finally, the defendant testified extensively not only about the fact that he continuously physically abused K.V., but also the manner in which he assaulted her.[21]

Compared to other prosecutorial remarks our Supreme Court has found to be improper, the prosecutor's remarks in cataloguing the evidence in this case were of a dispassionate nature.[22] The prosecutor did not employ any crude phrases or inflammatory language. The only fact he lingered on was the physical abuse of K.V., which served as a basis for the criminality charged in counts nine and ten of the information.[23]

We conclude therefore that the prosecutor did not improperly appeal to the emotions and passions of the jury during closing argument.[24]

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e. We therefore refer to the defendant as Elias V. and to the victims by their initials.

[1] For example, the defendant's sexual abuse of E.V. began with his touching and rubbing her vagina over her clothing. Later, the defendant would force E.V. to perform oral sex or masturbate him while watching pornography or viewing pornographic magazines.

[2] E.V. and K.V.'s brother has a physical disability and is wheelchair-bound.

[3] On other occasions when the defendant left visible marks on K.V., he insisted that she stay home from school until the marks were less apparent.

[4] See State v. Golding, 213 Conn. 233, 567 A.2d 823 (1989), as modified by In re Yasiel R., 317 Conn. 773, 781, 120 A.3d 1188 (2015).

[5] The record is unclear as to the exact date that the juror was excused. On February 3, 2014, the first day of trial, the court began the proceeding by informing counsel that "during the course of last week, one of the jurors called indicating that she had a—was diagnosed with a medical condition and she could not take part [in] this process. So, the court unilaterally excused her; so, we will need to pick an alternate to replace her."

[6] Although the defendant also asserts a due process violation under article first, § 8, of the Connecticut constitution, because he has not provided an independent analysis of his due process claim under the state constitution, we limit our consideration to the dictates of the federal constitution. See State v. Arthur H., 288 Conn. 582, 602, 953 A.2d 630 (2008).

The defendant also argues that the court violated his sixth amendment right to a public trial by dismissing the juror outside the courtroom during

a break in the proceedings. The record, however, reflects that there was neither a break in the proceedings nor a closure of the courtroom because the juror was excused by the court during the week before trial. Because we conclude that the court was not required to notify counsel before excusing the juror and because the court memorialized the circumstances surrounding the juror's excusal on the record, we reject the defendant's claim that his right to a public trial has been implicated.

[7] Although the defendant initially argued in his briefs before this court that he was entitled to a hearing and voir dire of the juror prior to the juror's excusal, at oral argument before this court, the defendant clarified that, at a minimum, his counsel needed to be notified in advance of the juror's potential excusal.

[8] "Although we overruled *Williams* in part in *State* v. *Murray*, [supra, 254 Conn. 487], [w]e [did] not, however, overrule that part of *State* v. *Williams*, supra, 231 Conn. 243–44, wherein we concluded that the mechanisms for providing for and dismissing alternate jurors, and the circumstances under which they may be substituted for regular jurors . . . does not implicate constitutional rights and are thus for the legislature to decide." (Internal quotation marks omitted). *State* v. *LaBrec*, supra, 270 Conn. 558 n.12.

[9] The defendant's reliance on *State* v. *McNellis*, 15 Conn. App. 416, 546 A.2d 292, cert. denied, 209 Conn. 809, 548 A.2d 441 (1988), for the proposition that the proceedings involving the substitution of an alternate juror for a regular juror constitutes a critical stage of the proceedings is misplaced. In *McNellis*, we stated that "[*t*]*he voir dire* of the jurors *concerning possible jury tampering* was a critical stage of the criminal proceeding" for the purposes of the defendant's right to be present, not that the decision to replace a regular juror with an alternate was in and of itself a critical stage of a criminal proceeding. (Emphasis added.) Id., 432.

As the state correctly notes, the processes for addressing allegations of potential juror impartiality, bias, or prejudice are also different in kind from those used to address illness. Those allegations squarely implicate a defendant's constitutional right to an impartial jury and, at times, require a court sua sponte to conduct a preliminary inquiry to assure itself that the defendant's rights are being preserved. See *State* v. *Brown*, 235 Conn. 502, 527–29, 668 A.2d 1288 (1995). Conversely, when a juror reports that he or she is no longer able to participate in a trial that has not commenced because of a recent medical diagnosis, the fairness and impartiality of the defendant's trial is not implicated.

[10] In announcing the excusal of the juror, the court informed the parties that a juror had called and explained that she "was diagnosed with a medical condition and she could not take part [in] this process." Neither the state nor the defendant inquired further or raised an objection.

[11] The defendant cites *Apodaca* for the proposition that he was entitled to examine the juror on her medical condition. In *Apodaca*, on the morning of the fifth day of trial, a juror called the criminal case flow coordinator to report flu-like symptoms. *State* v. *Apodaca*, supra, 303 Conn. 383. The resulting discussion on the record about the juror's illness stemmed from the participants' need to resolve whether the juror should be excused or trial should be delayed. Id., 383–85. Nothing in the Supreme Court's resolution of *Apodaca* suggested that the trial court was required to report the details of the juror's illness on the record before excusing her; the court merely needed to articulate a proper basis for its decision. See id., 386–87.

[12] The defendant also urges this court to modify the constancy of accusation doctrine so that it does not apply to sexual assault cases involving minors and to limit, or overrule, *State* v. *Troupe*, 237 Conn. 284, 677 A.2d 917 (1996) (en banc), in its entirety. We decline to address these claims other than to note that "as an intermediate appellate body, we are not at liberty to discard, modify, reconsider, reevaluate or overrule the precedent of our Supreme Court." *DePietro* v. *Dept. of Public Safety*, 126 Conn. App. 414, 422 n.3, 11 A.3d 1149, cert. granted on other grounds, 300 Conn. 932, 17 A.3d 69 (2011) (appeal withdrawn June 26, 2012).

[13] On the second day of trial, and after E.V.'s testimony, M.V. testified that E.V. told her once that "dad told me that if I didn't put his penis in my mouth he was going to penetrate me." On the third day of trial, Rodriguez testified as follows about her initial interview with E.V.:

"[The Prosecutor]: . . . Did she give you an account of how she had been sexually assaulted by [the defendant]?

"[The Witness]: She disclosed vaginal and anal penetration. She disclosed oral sex that she was obligated to do to [the defendant], and she disclosed positions as sixty-nine.

"[The Prosecutor]: Okay. And did she disclose how long she had been getting sexually assaulted for?

"[The Witness]: She said that she has been sexually abused since she was seven, and she told me that between the age of nine and ten, that's when he—the penetration started."

[14] The court instructed the jury concerning the constancy of accusation testimony as follows:

"The complainant testified here in court before you. You may use her testimony as evidence and proof of the facts asserted in that testimony, and give it the weight you find is reasonable.

"The state offered evidence of out-of-court statements made by the complainant to another person that the defendant sexually assaulted her. The person to whom the state alleges that complaint—that complainant made those statements to was Gloria Rodriguez.

"Under our law, the testimony of this witness was limited in scope to the fact and timing of the complainant's complaint, the time and place of the alleged sexual assault, and the identity of the alleged perpetrator.

"This evidence is to be considered by you only in determining the weight and credibility you will give the complainant's testimony as it pertains to all charges.

"This evidence of out-of-court statements by the complainant of a sexual assault against her by the defendant is not to be considered by you to prove the truth of the matter asserted in the out-of-court statement.

"In determining whether or not the out-of-court statements corroborate the complainant's testimony in court, you should consider all of the defendant's—I'm sorry—you should consider all of the circumstances under which they were made, and to whom, and whether the statements made to these persons were or were not consistent with [the] complainant's testimony in court.

"To the extent you find what she said outside the courtroom is consistent with her testimony in court, you may find her testimony in the court to be corroborated or supported with respect to the fact and timing of her complaint, the time and place of the alleged sexual assault, and the identity of the alleged perpetrator.

"You may consider any delay by the complaining witness in reporting the incidents in evaluating the weight and the credibility of the complaining witness' testimony."

[15] The following colloquy occurred during the prosecutor's cross-examination of the defendant:

"[The Prosecutor]: Isn't it ironic, though, you wanted her to go to school and you kept her home?

"[The Defendant]: Yeah.

"[The Prosecutor]: And you kept her home to sexually assault her, right?

"[The Defendant]: Never.

"[The Prosecutor]: Okay. Because the stakes are high here, right? You're on trial for sex assault crimes, correct?

"[The Defendant]: Yes.

"[The Prosecutor]: All right. You're incarcerated?

"[The Defendant]: Yes.

"[The Prosecutor]: Right. And you don't want to be labeled as a sex offender who sexually assaults his younger daughter, right?

"[The Defendant]: That didn't happen so, no, I don't want to.

"[The Prosecutor]: Right. And—and if you're labeled a sex offender in jail, that's not good, right?

"[The Defendant]: I suppose so."

[16] See *Anthony A.* v. *Commissioner of Correction*, 159 Conn. App. 226, 240, 122 A.3d 730 ("We can hardly conceive of a state's action bearing more stigmatizing consequences than the labeling of a prison inmate as a sex offender. . . . One need only look to the increasingly popular Megan's laws, whereby states require sex offenders to register with law enforcement officials who are then authorized to release information about the sex offender to the public, to comprehend the stigmatizing consequences of being labeled a sex offender." [Internal quotation marks omitted.]), cert. granted on other grounds, 319 Conn. 934, 125 A.3d 208 (2015); accord *State* v. *Misiorski*, 250 Conn. 280, 295, 738 A.2d 595 (1999) ("[c]onstitutional privacy interests are implicated . . . because . . . [t]he damage to [citizens'] reputations resulting from [disclosure] stigmatizes them as currently dangerous sex offenders, can harm their earning capacities, and can cause them to be objects of derision in the community" [internal quotation marks omitted]).

[17] The defendant and M.V. received social security disability benefits for

their son's physical disability. See footnote 2 of this opinion.

[18] For example, defense counsel made the following closing argument concerning E.V.'s motive to lie:

"And there's K.V. being assaulted and going to school. Well, that's going [to] hustle things up. [The department] is involved. [The department] talks to K.V. [The department] thinks, right, we see the physical assault, but we're not liking the kind of looking down and away, not making direct contact, and that we think something else is up. Well, there was a lot that was up, even without thinking about whether [or] not there was sex. But that's what the social worker assumed; there must be sexual assault too.

"And to the extent the ideas had already begun [to take] the form of, we cannot stand to have dad around anymore, he needs to go, at that moment, when the social worker says to E.V. prompts a disclosure, the idea formed: This will do it. This will do the trick."

At the end of his summation, defense counsel returned to that theme, arguing:

"The question is—the real question here, is, did he sexually assault E.V., and he told you he did not.

"So, right, [the prosecutor is] right. Did he believe E.V.? He's supposed to look at all the charges individually and consider them individually, but there's really no debate if you believe it. If you have some question about [E.V.'s] motivations for making these allegations, then that's what I'm trying to say, you know, I think she had pretty good motivations for making them; it's just a question of whether they're true. If that's the way you view the case, then I would respectfully request that you acquit [the defendant] of counts one through eight. Thank you."

[19] For example, on cross-examination, the prosecutor, without objection, engaged in the following colloquy with the defendant:

"[The Prosecutor]: You took all her money, right, from [your wife's] job?
"[The Defendant]: Yes.
"[The Prosecutor]: Did she say anything then?
"[The Defendant]: She didn't say anything.
"[The Prosecutor]: Do you know why?
"[The Defendant]: No.
"[The Prosecutor]: She just said, here's my check, or did you steal it?
"[The Defendant]: I only asked for it.
"[The Prosecutor]: And explain that. How did you ask for it?
"[The Defendant]: If she got a few dollars I can—can have.
"[The Prosecutor]: When you say a few dollars, what do you mean?
"[The Defendant]: Forty, $50.
"[The Prosecutor]: And she wasn't making any money, right?
"[The Defendant]: Not much, no.
"[The Prosecutor]: You took your son's [social security disability] check, right?
"[The Defendant]: On occasions, yes.
"[The Prosecutor]: Why did you take that?
"[The Defendant]: To drug myself.
"[The Prosecutor]: And didn't your ex-wife say, why you taking all this money?
"[The Defendant]: Yes.
"[The Prosecutor]: What did you say to her?
"[The Defendant]: I said I—you high, you need the money. I never answered that, I just need it.
"[The Prosecutor]: You—you never answered it. I don't under—can you repeat that?
"[The Defendant]: I say, I never answer when I wanted the money, I just say and you don't need it. You don't think, you know, you just want to keep getting high."

[20] E.V. and K.V. testified that the arrearage was $8000, while the defendant on cross-examination agreed with the prosecutor that the arrearage was $7000.

[21] For example, on cross-examination, the prosecutor, without objection, engaged in the following colloquy with the defendant:

"[The Prosecutor]: Okay. Does discipline mean hitting [K.V.] physically?
"[The Defendant]: Not supposed to, but yes. That's what I was doing.
"[The Prosecutor]: Okay. And tell us how you hit her that day?
"[The Defendant]: To be honest, I don't—I don't remember. I know hurt her with my hand. Every part of the body, I don't remember?
"[The Prosecutor]: You don't remember?
"[The Defendant]: I don't remember which part I hit her with.
"[The Prosecutor]: Okay. How many—

"[The Defendant]: But I know I did it.

"[The Prosecutor]: Let me finish my question. How many times did you hit her in the body that day?

"[The Defendant]: Multiple times.

"[The Prosecutor]: Multiple times?

"[The Defendant]: Yes.

"[The Prosecutor]: In the head?

"[The Defendant]: Yes.

"[The Prosecutor]: You clapped her ears.

"[The Defendant]: Yes.

"[The Prosecutor]: You punched her.

"[The Defendant]: I punched her, yes.

"[The Prosecutor]: You kicked her.

"[The Defendant]: I don't remember that.

"[The Prosecutor]: You had boots, right?

"[The Defendant]: I wasn't home.

"[The Prosecutor]: You weren't home?

"[The Defendant]: I wasn't home.

"[The Prosecutor]: Okay. Were you wearing boots?

"[The Defendant]: Sneakers.

"[The Prosecutor]: Sneakers?

"[The Defendant]: Yes, sir.

"[The Prosecutor]: Do you own boots?

"[The Defendant]: What's that?

"[The Prosecutor]: Do you own boots?

"[The Defendant]: Yes.

"[The Prosecutor]: They have steel toe on them?

"[The Defendant]: No.

"[The Prosecutor]: Okay. And then you also pretended that you were going to throw her down the stairs, right, but you didn't?

"[The Defendant]: Did I push her?

"[The Prosecutor]: You were going to but then you held back, right?

"[The Defendant]: Yes.

"[The Prosecutor]: Was she crying?

"[The Defendant]: Yes.

"[The Prosecutor]: Screaming?

"[The Defendant]: Yes.

"[The Prosecutor]: What was she saying?

"[The Defendant]: Stop.

"[The Prosecutor]: And you're beating her so hard she was [huddled] on the ground, correct?

"[The Defendant]: That happen when I stop.

"[The Prosecutor]: That happened, but she lost her breath; she couldn't breathe at one point.

"[The Defendant]: I cannot tell.

"[The Prosecutor]: You cannot tell? You were on crack that day too?

"[The Defendant]: Yes.

"[The Prosecutor]: Okay. What time is this at?

"[The Defendant]: The afternoon.

"[The Prosecutor]: How much—how much crack did you smoke at that time?

"[The Defendant]: No idea.

"[The Prosecutor]: Okay. And this is not the first time you beat her, right?

"[The Defendant]: No.

"[The Prosecutor]: You beat her on Wethersfield Avenue.

"[The Defendant]: Yes.

"[The Prosecutor]: You beat her on New Donald Street.

"[The Defendant]: Yes.

"[The Prosecutor]: You beat her on Barbour Street.

"[The Defendant]: Yes.

"[The Prosecutor]: Continuously, correct?

"[The Defendant]: Yes.

"[The Prosecutor]: Okay. Kicking?

"[The Defendant]: Yes.

"[The Prosecutor]: Fist?

"[The Defendant]: I never used fist.

"[The Prosecutor]: Oh, you never used your fist. You use your hand?

"[The Defendant]: Open hand.

"[The Prosecutor]: Is it possibly—is it possible that when you swung at her it might have hit her with [your] fist?

"[The Defendant]: It couldn't be because I used my open hand.

"[The Prosecutor]: Oh, Okay. Did you kick.

"[The Defendant]: On occasions, yes.

"[The Prosecutor]: In the stomach?

"[The Defendant]: Possible.

"[The Prosecutor]: In the ribs?

"[The Defendant]: Yes.

"[The Prosecutor]: In the head?

"[The Defendant]: Yes."

[22] See *State* v. *Oehman*, 212 Conn. 325, 333, 562 A.2d 493 (1989) (prosecutor characterized the defendant as a " 'liar,' " " 'coward,' " and a " 'spoiled killer with a gun' " that " 'has no principles' "); *State* v. *Williams*, supra, 204 Conn. 546–47 (prosecutor called defendant, inter alia, " 'child-beater,' 'baby-beater' and 'infant-thrasher,' " "a 'liar,' 'drunken drug user, convicted felon, child beater,' 'stupid,' 'savage child beater,' 'drunken bum,' 'evil man,' " and referred to principal defense witness as " 'liar,' " " 'stupid,' " an " 'evil woman,' and an 'evil, terrible woman' "); *State* v. *Couture*, 194 Conn. 530, 561, 482 A.2d 300 (1984) (prosecutor, reading from a prepared text, denounced the defendants as " 'murderous fiends,' 'rats,' 'utterly merciless killers,' and 'inhumane, unfeeling and reprehensible creatures' "), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985).

[23] Both counts charged the defendant with risk of injury to a child by exposing E.V., *inter alia*, to his physical abuse of K.V.

[24] Having concluded that the defendant's claims do not constitute prosecutorial impropriety, we need not address the factors set forth in *State* v. *Williams*, supra, 204 Conn. 540, to determine whether the defendant was deprived of his right to a fair trial as a result of prosecutorial impropriety.

---